# MAYOR OF PHILADELPHIA $v.$ EDUCATIONAL EQUALITY LEAGUE ET AL.

No. 72–1264.  Argued December 10, 1973—Decided March 25, 1974

PowELL, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Blackmun, and Rehnquist, JJ., joined. White, J., filed a dissenting opinion, in which Brennan and Marshall, JJ., joined, and in Part II of which Douglas, J., joined, *post*, p. 633.

*John Mattioni* argued the cause and filed briefs for petitioner.

*Edwin D. Wolf* argued the cause and filed a brief for respondents.

Mr. Justice Powell delivered the opinion of the Court.

In 1965 the voters of Philadelphia approved a public education supplement to their city charter establishing the present structure of the Philadelphia Board of Education (the School Board or Board). The supplement, which appears as Art. XII of the city charter,[1] vests in the Mayor a double appointment power with regard to the School Board. The Mayor appoints the nine

---

[1] The relevant provisions of Art. XII of the Philadelphia Home Rule Charter are set forth as an appendix, *infra*, p. 629 *et seq.*

members of the Board, but he is assisted in that task by another entity that he also appoints, the Educational Nominating Panel (the Nominating Panel or Panel). The function of the Panel is to seek out qualified candidates for service on the School Board by polling civic organizations and the citizenry at large, to interview those candidates, to deliberate on their qualifications, and to submit selected nominees to the Mayor. The Panel submits three nominees for every vacancy on the Board. In his discretion, the Mayor may request an additional three nominees per vacancy. The Mayor must then make appointments to the School Board from among the nominees submitted by the Panel.

The Nominating Panel consists of 13 members. Under the terms of the city charter, the Mayor appoints four members of the Panel from the citizenry at large. Each of the remaining members must be the highest ranking officer of one of nine categories of citywide organizations or institutions, such as a labor union council, a commerce organization, a public school parent-teachers association, a degree-granting institution of higher learning, and the like.[2] Although the city charter describes with

---

[2] Section 12–206 (b) of Art. XII of the Philadelphia Home Rule Charter provides:

"Nine members of the Educational Nominating Panel shall be the highest ranking officers of City-wide organizations or institutions which are, respectively:

"(1) a labor union council or other organization of unions of workers and employes organized and operated for the benefit of such workers and employes,

"(2) a council, chamber, or other organization established for the purpose of general improvement and benefit of commerce and industry,

"(3) a public school parent-teachers association,

"(4) a community organization of citizens established for the purpose of improvement of public education,

substantial specificity the nine categories of organizations or institutions whose leaders may serve on the Nominating Panel, the charter does not designate any particular organization or institution by name. Accordingly, it is possible for more than one such citywide entity to qualify under any given category.

The members of the Nominating Panel serve two-year terms. A new Panel is appointed and convened in every odd-numbered year, when, in the ordinary course, three vacancies occur on the School Board.[3] Thus, since 1965 there have been five Panels. Mayor James J. H. Tate, whose term expired in 1972, appointed the 1965, 1967, 1969, and 1971 Panels. The present Mayor, Frank Rizzo, appointed the 1973 Panel.

Respondents include the Educational Equality League,[4] the president of the League, another citizen of Philadelphia, and two students attending the city's public schools. Shortly after Mayor Tate's appointment

---

"(5) a federation, council, or other organization of non-partisan neighborhood or community associations,

"(6) a league, association, or other organization established for the purpose of improvement of human and inter-group relations,

"(7) a non-partisan committee, league, council, or other organization established for the purpose of improvement of governmental, political, social, or economic conditions,

"(8) a degree-granting institution of higher education whose principal educational facilities are located within Philadelphia, and

"(9) a council, association, or other organization dedicated to community planning of health and welfare services or of the physical resources and environment of the City."

[3] The Mayor must also convene the Nominating Panel whenever a vacancy occurs on the School Board due to resignation, removal, or other unexpected event.

[4] The Educational Equality League is a nonprofit corporation devoted to safeguarding the educational rights of all Philadelphia citizens regardless of race. It was founded in 1932 and presently has approximately nine hundred members.

of the 1971 Nominating Panel, respondents filed this suit as a class action in the United States District Court for the Eastern District of Pennsylvania, relying on 42 U. S. C. § 1983 and 28 U. S. C. § 1343 (3). The gravamen of their complaint, which named the Mayor of Philadelphia and the Nominating Panel as defendants, was that Mayor Tate had violated the Equal Protection Clause of the Fourteenth Amendment by discriminating against Negroes in his appointments to the 1971 Panel. Respondents sought an injunction barring the 1971 Panel from submitting nominees for the Board to the Mayor and a declaratory judgment that Mayor Tate had violated the Constitution. They also requested an order directing the Mayor to appoint a Nominating Panel "fairly representative of the racial composition of the school community."

Respondents did not challenge the racial composition of the School Board, which consisted of two Negroes and seven whites when respondents filed their complaint and which now consists of three Negroes and six whites.[5] They did not allege that the 1971 Panel discriminated in its submission of School Board nominees to the Mayor.[6] Such an attack would have been difficult to

---

[5] *Educational Equality League* v. *Tate,* 333 F. Supp. 1202, 1204 (ED Pa. 1971); Tr. of Oral Arg. 14. In their complaint respondents alleged that Mayor Tate had denied Negroes "proper representation" on the School Board. But respondents have not pursued this contention at any stage of this suit.

[6] Counsel for respondents commented at oral argument that respondents "are not in any way attacking the actions of the panel." Tr. of Oral Arg. 44. See *id.,* at 24. This apparently means only that respondents do not contend that the 1971 Panel in fact excluded Negroes from consideration in recommending School Board nominees to the Mayor. It does not mean that respondents do not seek to undo what the Panel has done. Indeed, respondents have sought relief that would invalidate the nominations made by the Panel, on the theory that the Panel was selected in violation of the Constitu-

mount in any event. Of the nine nominees submitted
to the Mayor by the 1971 Panel, four were Negroes and
five were whites.[7] Moreover, respondents did not dispute
the validity of the qualifications set forth in the
city charter with regard to the Nominating Panel. Fi-
nally, despite the prayer in their complaint for an order
directing the appointment of a Panel "fairly representa-
tive of the racial composition of the school commu-
nity . . . ," respondents disclaimed any effort to impose a
racial quota on the Mayor in his appointments to the
Panel.[8] Respondents sought solely to establish that the
Mayor unconstitutionally excluded qualified Negroes from
consideration for membership on the Nominating Panel
and to remedy that alleged defect prospectively as well
as retrospectively.[9]

Following two days of hearings, the District Court
dismissed respondents' complaint. *Educational Equality
League* v. *Tate,* 333 F. Supp. 1202 (ED Pa. 1971). In
its findings of fact, the court noted that approximately
34% of the population of Philadelphia and approxi-
mately 60% of the students attending the city's various
schools were Negroes. *Id.,* at 1202–1204. The court
found the following racial composition of the Nominating

---

tion and that its actions, although not discriminatory, are voidable.
See nn. 9, 12, *infra.*

[7] *Educational Equality League* v. *Tate, supra,* at 1204.

[8] Tr. of Oral Arg. 25. See *Educational Equality League* v. *Tate,*
472 F. 2d 612, 616 (CA3 1973).

[9] Although respondents' suit is addressed to the Nominating Panel,
the relief they seek would have an impact on the School Board as
well. In order to cure any taint deriving from the allegedly unlaw-
ful selection of the 1971 Panel, respondents take the view that the
federal courts should remove from the Board all persons nominated
by that Panel. Tr. of Oral Arg. 37, 43–44. Given the racial mix
of the present Board, this would require the removal of Negroes
as well as whites. *Id.,* at 44.

Panels from 1965 to 1971: the 1965 Panel had 10 whites and three Negroes; the 1967 Panel had 11 whites and two Negroes; the 1969 Panel had 12 whites and one Negro; and the 1971 Panel had 11 whites and two Negroes.[10]  *Id.,* at 1204.  The court further found that "several organizations reflecting the views and participation of the black community" could qualify as organizations whose highest ranking officers might serve on the Nominating Panel.  *Ibid.*  The court also found that Deputy Mayor Zecca, the person assigned by Mayor Tate to assist in selecting qualifying organizations and institutions, at the time of the hearing was unaware of the existence of many of these "black organizations."  *Ibid.*

On the basis of its finding of fact, the District Court concluded that respondents had failed to prove that the 1971 Panel was appointed in violation of the Fourteenth Amendment.  It held that differences between the percentage of Negroes in the city's population (34%) or in the student body of the public school system (60%) and the percentage of Negroes on the 1971 Nominating Panel (15%) had no significance.  *Id.,* at 1205–1207. In large part this was because the number of positions on the Panel was too small to provide a reliable sample; the addition or subtraction of a single Negro meant an 8% change in racial composition.  *Id.,* at 1206.  The court also rejected as unreliable data submitted by respondents in an effort to show that Mayor Tate's appointments to various positions in the city government other than the Panel reflected a disproportionately low

---

[10] Mayor Tate's appointments to the 1971 Panel initially consisted of 12 whites and one Negro.  However, after Mayor Tate selected the president of a particular citywide organization but before the 1971 Panel convened, the leadership of the organization changed hands, and its white president was replaced by a Negro.  The Mayor then reaffirmed his selection of that organization, which produced the 11-to-2 racial mix of the 1971 Panel.

percentage of Negroes and a pattern of discrimination. *Ibid.* Moreover, the court dismissed as inadmissible hearsay a 1969 newspaper account of an alleged statement by Mayor Tate that at that time he would appoint no more Negroes to the School Board. *Ibid.*

The Court of Appeals for the Third Circuit reversed. *Educational Equality League* v. *Tate,* 472 F. 2d 612 (1973).[11] Relying on statistical data about the Panel rejected by the District Court and going outside that court's findings of fact in other respects, the Court of Appeals concluded that respondents had established an unrebutted prima facie case of unlawful exclusion of Negroes from consideration for service on the 1971 Panel. *Id.,* at 618. Moreover, although the Mayor's office had changed hands while the case was *sub judice* and although there was nothing in the record addressed to the appointment practices of the new Mayor with regard to the Nominating Panel, the Court of Appeals directed the issuance of extensive injunctive relief against the new Mayor. *Id.,* at 619. In particular, the Court of Appeals ordered the District Court to undertake an ongoing supervision of the new Mayor's appointments to the 1973 Panel and future Panels. *Ibid.*[12]

---

[11] The Court of Appeals held that the Nominating Panel is not a "person" within the meaning of 42 U. S. C. § 1983, and it therefore affirmed the District Court's dismissal of the complaint as to the Panel. 472 F. 2d, at 614, nn. 1 and 4. Respondents do not seek review of this holding, and we do not address it.

[12] The Court of Appeals remanded to the District Court the question of whether those persons appointed to the School Board from among the nominees submitted by the 1971 Panel should be removed from office. *Id.,* at 618 n. 20. In an unsuccessful petition for rehearing filed with the Court of Appeals, respondents requested the court to modify its opinion "and specifically direct the District Court to use appropriate equitable remedies to assure that all members of the School Board who were appointed through the unconstitutional processes described in this case, be promptly

We granted the Mayor's petition for certiorari. 411 U. S. 964 (1973). We conclude that the Court of Appeals erred in overturning the District Court's findings and conclusions. We also hold that it erred in ordering prospective injunctive relief against the new Mayor in a case devoted exclusively to the personal appointment policies of his predecessor.

I

The Mayor's principal contention is that judicial review of the discretionary appointments of an executive officer contravenes basic separation-of-powers principles. The Mayor cites cases concerning discretionary appointments in the Federal Executive Branch, such as *Marbury* v. *Madison*, 1 Cranch 137 (1803), and *Myers* v. *United States*, 272 U. S. 52 (1926). He notes that Pennsylvania, like the Federal Government, has a tripartite governmental structure, and he argues that the principles shaping the appropriate scope of judicial review are the same at the state level as at the federal level.

Neither the District Court nor the Court of Appeals addressed this argument at length. The District Court expressed its "reservations" about exerting control over "an elected chief executive in the exercise of his discretionary appointive power. . . ," 333 F. Supp., at 1206, but that court based its dismissal of respondents' complaint on the absence of proof of discrimination. The Court of Appeals brushed aside the "reservations" of the District Court, concluding that the Nominating Panel was not intended to operate as part of the Mayor's staff and thus that the appointments were not discre-

replaced by persons appointed as a result of a nominating process which conforms to the requirements of the Fourteenth Amendment, these equitable remedies to take into account the necessity of having an operating school board at all times."

tionary.   472 F. 2d, at 617.   And, although nine of the seats on the Panel are subject to restrictive qualifications embodied in the city charter, which are not challenged by respondents, the Court of Appeals proceeded as though this were a case where access to participation in a governmental or other entity or function is open to all citizens equally.   Drawing by analogy from cases dealing with such incidents of citizenship as jury service and the right to nondiscrimination in employment, *e. g., Turner* v. *Fouche,* 396 U. S. 346 (1970), and *Smith* v. *Yeager,* 465 F. 2d 272 (CA3), cert. denied, *sub nom. New Jersey* v. *Smith,* 409 U. S. 1076 (1972), the court declared that "a prima facie case is established by a demonstration that blacks were under-represented [on the Panel] and that there was an opportunity for racial discrimination."   472 F. 2d, at 618.

We disagree with the Court of Appeals' conclusion that the appointments at issue are not discretionary. The court's view that the Panel is not a part of the staff of the mayor is not self-evident, as we understand the functions of the Panel.   But in any event this is irrelevant to whether the Mayor's power to appoint the Panel is discretionary.   Executive officers are often vested with discretionary appointment powers over officials who by no stretch of the imagination are members of the staff of the appointing officer.   The appointment of judges is a familiar example.   Likewise, the appointments to the Panel are discretionary by any reasonable measure. With regard to the four seats on the Panel devoted to the citizenry at large, the city charter holds the Mayor accountable only at the polls.   And, although the charter narrows the Mayor's range of choice in filling the other nine seats, it remains true that the final selection of the membership of the Panel rests with the Mayor, subject always to the oversight of the voters.

It is also our view that the Court of Appeals did not assign appropriate weight to the constitutional considerations raised by the Mayor. To be sure, the Mayor's reliance on federal separation-of-powers precedents is in part misplaced, because this case, unlike those authorities, has nothing to do with the tripartite arrangement of the Federal Constitution.[13] But, to the degree that the principles cited by the Mayor reflect concern that judicial oversight of discretionary appointments may interfere with the ability of an elected official to respond to the mandate of his constituency, they are in point. There are also delicate issues of federal-state relationships underlying this case. The federalism questions are made particularly complex by the interplay of the Equal Protection Clause of the Fourteenth Amendment, with its special regard for the status of the rights of minority groups and for the role of the Federal Government in protecting those rights. The difficulty of the issues at stake has been alluded to by the Court, without elaboration, as recently as in *Carter* v. *Jury Comm'n of Greene County,* 396 U. S. 320 (1970). *Carter* concerned a state governor's alleged discriminatory exclusion of Negroes in his discretionary appointments to a county jury commission. The Court found on the record an absence of proof of discrimination, but it nevertheless recognized "the problems that would be involved in a federal court's ordering the Governor of a State to exercise his discretion in a particular way . . . ." *Id.,* at 338.[14]

---

[13] This is not to say, of course, that the State of Pennsylvania may not pattern its government after the scheme set forth in the Federal Constitution or in any other way it sees fit. The Constitution does not impose on the States any particular plan for the distribution of governmental powers. See *Sweezy* v. *New Hampshire,* 354 U. S. 234, 256 (1957) (Frankfurter, J., concurring).

[14] In a concurring opinion in *Carter,* Mr. Justice Black revealed

Were we to conclude that respondents had established racial discrimination in the selection process for the Panel, we would be compelled to address the "problems" noted in *Carter, supra,* and raised by the Mayor. We need not go so far, however, because we find that this case founders on an absence of proof, even under the approach taken by the Court of Appeals.

## II

The Court of Appeals bottomed its conclusion that the Fourteenth Amendment had been violated on three indicia, only one of which was based on a finding by the District Court. Whether taken singly or in combination, these factors provide no adequate basis for the court's conclusion that respondents had established a prima facie case of racial discrimination.

First, the Court of Appeals relied on an alleged statement by Mayor Tate in 1969 that in filling the vacancies then open on the *School Board* he would appoint no Negroes in addition to the two already on it. 472 F. 2d, at 615–616. Respondents presented two items as evidence of this statement. During cross-examination of Deputy Mayor Zecca, counsel for respondents directed Mr. Zecca's attention to a 1969 newspaper article dealing with the alleged statement. Deputy Mayor Zecca denied the accuracy of the newspaper account; [15] the

_____

that for him these "problems," as the Court put it, were conclusive. "In my judgment the Constitution no more grants this Court the power to compel a governor to appoint or reject a certain individual or a member of any particular group than it grants this Court the power to compel the voters of a State to elect or defeat a particular person or a member of a particular group." 396 U. S., at 341. Mr. Justice Black's views have not, however, been adopted by the Court.

[15] The interchange between counsel for respondents and Mr. Zecca concerning the 1969 statement, App. 91a–93a, was as follows:
"BY MR. WOLF:
"Q. Mr. Zecca, we were discussing earlier a statement by Mayor

District Court ruled that the newspaper account was inadmissible hearsay.[16] The Court of Appeals made no mention of this newspaper account. Rather, although noting that the District Court had made no finding on the subject, the court focused on the testimony of one of respondents' witnesses that Mayor Tate had made the 1969 statement.[17] The court apparently assumed the

Tate in 1969 that he would not appoint any additional Negroes to the School Board and you said you didn't recall that statement.

"A. I said I don't think that he made such a statement.

"Q. Well, all right.

"May I show you a very bad copy of a page of the Philadelphia Inquirer, Saturday, May 3, 1969, and the article says he indicated, referring to the Mayor, he would not appoint another Negro to the Board because the Negro community has good representation in the two Negroes now serving on the Board.

"Do you recall that article?

.            .            .            .            .

"THE WITNESS: I don't recall the article specifically but it doesn't say he is not going to name another member.

"It said that he indicated that he wouldn't name another member; and this is, of course, the reporter's version of this, but the quote said the Negro community has good representation in the two Negroes now serving on the Board.

"They may have asked him whether he was going to appoint any more Negroes to the Board and he said the Negro community has good representation on the Board as it is; just like it has excellent representation right in this story.

"BY MR. WOLF:

"Q. You don't recall, however, this having happened?

"A. No."

[16] 333 F. Supp., at 1206.

[17] Under direct examination by respondents' counsel, the witness testified: ·

"At that time [in 1969] the Mayor made a public statement that he was not going to appoint any more Negroes to the Board because, in his feeling, they had adequate representation and that he was going to appoint someone from the nominees to the Board of Education." App. 41a.

truth of the statement, for it declared that the testimony was made "without contradiction or objection . . . ."[18]

In our view, the Court of Appeals' reliance on the alleged 1969 statement was misplaced. Assuming the admissibility and reliability of such double hearsay,[19] we are unable to conclude that an ambiguous statement purportedly made in 1969 with regard to the racial composition of the then School Board proves anything with regard to the Mayor's motives two years later in appointing the 1971 Nominating Panel. The Court of Appeals noted that if the Mayor had in 1969 decided to exclude Negro nominees from appointment to the Board, "an inference may be drawn that the Mayor in similar manner excluded blacks from consideration as members

---

[18] 472 F. 2d, at 616. The testimony was in fact contradicted by Deputy Mayor Zecca while under cross-examination by respondents' counsel. See n. 15, *supra*.

[19] There is some question in the record whether respondents' witness' knowledge of the 1969 statement derived from the 1969 newspaper account that the District Court ruled inadmissible hearsay or from an independent source. At oral argument, counsel for respondents informed the Court that the witness giving the testimony had heard the statement on television, although counsel conceded that this had not been made clear in the record. Tr. of Oral Arg. 31. Whether the testimony reflected the newspaper account or a television report, it was nonetheless hearsay. The Court of Appeals made no effort to determine whether the testimony met any recognized exception to the general rule that hearsay is inadmissible.

The dissenting opinion, based in part on this single ambiguous piece of testimony, argues that this "highly probative evidence" was not hearsay. *Post*, at 644. It may have been admissible for what it was worth as an exception to the hearsay rule, but *hearsay* it certainly was—and its probative value was so dubious that the District Court ignored it. Mayor Tate was not called as a witness by either side and accordingly did not testify. Thus, it is hardly surprising that "nowhere in this record can one find a denial by Mayor Tate that he did not say what the testimony indicated." *Post*, at 645.

of the 1971 Panel." 472 F. 2d, at 616 n. 9. That inference is supposition. It cannot be viewed as probative of a future intent to discriminate on the basis of race with regard to a different governmental entity. Furthermore, it is refuted by the fact that the Mayor later appointed Negroes to the 1971 Panel and, for that matter, to the School Board itself.

Second, the Court of Appeals cited the District Court's finding that Deputy Mayor Zecca had been unaware of many "black-oriented organizations" that could qualify under the categories of organizations and institutions set out in the city charter. *Id.*, at 616. The court thought that, given Mr. Zecca's important position in the appointment process in 1971, his ignorance would "support an inference that the selection process had a discriminatory effect." *Id.*, at n. 13. This is another speculative inference. Deputy Mayor Zecca did not make the appointments to the Panels. That task belonged to Mayor Tate. It is unlikely that an elected mayor would be ignorant of any viable citywide organization or institution, particularly if he had held office for a number of years. Thus Deputy Mayor Zecca's unfamiliarity with certain organizations may not be imputed automatically to the official holding the appointment power. Moreover, there has been no showing in this record that Mr. Zecca's unawareness of organizations or institutions was restricted to what the Court of Appeals referred to as "black-oriented organizations." *Id.*, at 616. The Deputy Mayor may well have been equally uninformed of the existence of many other Philadelphia organizations and groups.

As a third indicator of the exclusion of Negroes, the Court of Appeals again went outside the District Court's findings. As noted earlier, the District Court rejected as unreliable, percentage comparisons of the racial com-

position of the Panel and of the population of Phila-delphia. 333 F. Supp., at 1206, 1207. The Court of Appeals thought it unfortunate that "the parties did not introduce the expert testimony of a statistician on whether the frequency of black appointments to the 13-member Panel fell outside the range to be expected were race not a factor. . . ," 472 F. 2d, at 618, but never-theless found the small proportion of Negroes on the Panel "significant." *Ibid.* This led the court to conclude that "the small proportion of blacks on the Panel points toward the possibility of discrimination." *Ibid.*

Statistical analyses have served and will continue to serve an important role as one indirect indicator of racial discrimination in access to service on governmental bod-ies, particularly where, as in the case of jury service, the duty to serve falls equally on all citizens. *E. g., Carter* v. *Jury Comm'n of Greene County,* 396 U. S. 320 (1970) ; *Hernandez* v. *Texas,* 347 U. S. 475 (1954) ; *Avery* v. *Georgia,* 345 U. S. 559 (1953). See *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 805 (1973) (employment discrimination). But the simplistic percentage com-parisons undertaken by the Court of Appeals lack real meaning in the context of this case. Respondents do not challenge the qualifications for service on the Panel set out in the charter, whereby nine of the 13 seats are restricted to the highest ranking officers of designated categories of citywide organizations and institutions. Accordingly, this is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlaw-fully excluded. At least with regard to nine seats on the Panel and assuming, *arguendo,* that percentage compari-sons are meaningful in a case involving discretionary ap-pointments, the relevant universe for comparison purposes consists of the highest ranking officers of the categories of

organizations and institutions specified in the city charter, not the population at large. The Court of Appeals overlooked this distinction. Furthermore, the District Court's concern for the smallness of the sample presented by the 13-member Panel was also well founded. The Court of Appeals erred in failing to recognize the importance of this flaw in straight percentage comparisons.

In sum, the Court of Appeals' finding of racial discrimination rests on ambiguous testimony as to an alleged statement in 1969 by then Mayor Tate with regard to the 1969 School Board, not the 1971 Panel; the unawareness of certain organizations on the part of a city official who did not have final authority over or responsibility for the challenged appointments; and racial-composition percentage comparisons that we think were correctly rejected by the District Court as meaningless. In our view, this type of proof is too fragmentary and speculative to support a serious charge in a judicial proceeding.[20]

## III

The Court of Appeals prefaced its discussion of appropriate relief by noting that it would be "the district court's function to determine the precise nature

---

[20] We share the view expressed in the dissent that facts in a case like the instant one, "when seen through the eyes of judges familiar with the context in which they occurred, may have special significance that is lost on those with only the printed page before them." *Post,* at 644. That is one reason why we believe that the Court of Appeals, "with only the printed page before [it] . . . ," erred in reversing the District Court. The judge most "familiar with the context in which [the facts] occurred . . ." was obviously the District Judge, since he heard and viewed the testimony and other evidence presented. Nothing in our opinion should be seen as detracting from the salutary principle that great weight should be accorded findings of fact made by district courts in cases turning on peculiarly local conditions and circumstances. *E. g., White* v. *Regester,* 412 U. S. 755, 769–770 (1973).

of the relief to which [respondents] are entitled." 472 F. 2d, at 618. Nevertheless, the court held, in part, that the District Court "should enjoin the present Mayor from discriminating in regard to the 1973 or future Panels and should require that before the 1973 Panel is selected, the Mayor or his staff submit to the court evidence that organizations in the black community . . . have received proper consideration." *Id.,* at 619. (Footnote omitted.)

Mayor Tate was succeeded by Mayor Rizzo on January 3, 1972. The Court of Appeals issued its opinion on January 11, 1973. Accordingly, the injunctive orders mandated by the court with regard to the 1973 and future Panels would have run against Mayor Rizzo, not Mayor Tate. As its sole reason for directing such relief against Mayor Rizzo, the Court of Appeals noted that Mr. Zecca continued as Deputy Mayor under the Rizzo administration. *Id.,* at 619 n. 21. But petitioner alleges, and respondents do not deny, that under Mayor Rizzo's stewardship, Mr. Zecca no longer has any responsibility with regard to Panel appointments. Moreover, the entire case has been focused on the appointments made by Mayor Tate. Nothing in the record speaks to the appointment policies of Mayor Rizzo with regard to the Panel. Thus, the record does not support the premise that Mayor Rizzo's appointment record for the Panel will track that of his predecessor.

Where there have been prior patterns of discrimination by the occupant of a state executive office but an intervening change in administration, the issuance of prospective coercive relief against the successor to the office must rest, at a minimum, on supplemental findings of fact indicating that the new officer will continue the practices of his predecessor. *E. g., Spomer* v. *Littleton,* 414 U. S. 514 (1974). The Court of Appeals did not have the benefit of such findings at the time it instructed

the District Court to enter injunctive relief against Mayor Rizzo with regard to future Panels. The Court of Appeals therefore erred in its decision on remedies, as well as in concluding that respondents had established a violation of the Fourteenth Amendment.

## IV

We turn, finally, to the dissent's argument that this case should be remanded to the District Court for resolution of state law issues under the court's pendent jurisdiction or, in the alternative, for abstention so that the case may be tried from scratch in state court. This approach ignores what the parties have briefed and argued before us, espouses on behalf of respondents state law claims of barely colorable relevance to the instant suit, and would produce a result inconsistent with a commonsense application of the pendent jurisdiction and abstention doctrines.

As the dissent concedes, *post,* at 642, its state law arguments were neither raised in the petition, argued in the briefs, nor articulated in oral argument before this Court. To address them would require us to disregard the admonition of Supreme Court Rule 23.1 (c) that "[o]nly the questions set forth in the petition or fairly comprised therein will be considered by the court." See also, *e. g., Mazer* v. *Stein,* 347 U. S. 201, 206 n. 5 (1954); *National Licorice Co.* v. *NLRB,* 309 U. S. 350, 357 n. 2 (1940); *General Talking Pictures Corp.* v. *Western Electric Co.,* 304 U. S. 175, 177–178 (1938). Moreover, the assertion that pendent jurisdiction is appropriate and that pendent state claims should be decided first presumes that the state claims have color and make it possible for the case to be "decided without reference to questions arising under the Federal Constitution . . . ." *Siler* v. *Louisville & Nashville R. Co.,*

213 U. S. 175, 193 (1909). That is not true here. In their complaint, respondents set out the following four points of state law and no others: that the 1971 Panel was convened on May 28, whereas the Charter required May 25; that the Mayor appointed the chairman of the Panel, although the Charter allegedly restricts that appointment responsibility to the Panel itself; that one of the Mayor's appointees was not the highest ranking officer of the organization he represented; and that the Mayor appointed certain city officials to the Panel, in alleged contravention of the Charter. A decision for respondents on all of these issues would not have approached resolving the case nor would it have provided a basis for granting the relief to which respondents laid claim. These state law claims were wholly tangential to the principal theme of respondents' lawsuit—an alleged violation of the Equal Protection Clause of the Fourteenth Amendment. It is hardly surprising that respondents have not pursued these claims at either stage of appellate review. In fact, respondents scarcely addressed them in the District Court.

At the opening of the evidentiary hearings, the District Court asked counsel for respondents to describe the basis of the suit. Counsel responded that "the single issue in the case, as we have presented it, is whether there has been racial discrimination in violation of the Fourteenth Amendment in the composition of the Nominating Panel." Tr., Aug. 25, 1971, p. 4. There could be no clearer statement that a litigant's case turns on federal, rather than state, law. And respondents presented their case, as they had drafted their complaint, essentially as an exposition of federal law. To ignore all of this and to compel the District Court now to decide nondispositive state law questions would require a unique reading of the pendent jurisdiction doctrine.

Despite the language of the complaint, respondents' counsel's characterization of the suit before the District Court, and the almost exclusively federal character of the record, the dissent attributes to respondents an independent state law argument that the charter requires "a balanced racial composition on the Panel *as a whole. . . .*" (Emphasis added.) *Post,* at 638. In our view, this is a misreading of the record. Midway through the hearing, the District Court asked respondents whether they were asserting a claim under the language of the charter. Respondents' counsel replied in a manner that makes clear that he viewed the charter as merely supportive of the federal law claim and as a part only of a general "picture" or "image" of racial discrimination, not as an independent requirement of racial balance on the Panel as a whole.[21]

---

[21] The relevant interchange was as follows:

"THE COURT. Do I understand you to say that it is your interpretation of the wording of the charter in connection with the makeup of the panel that it should be representative of the community generally? Is that what you are saying?

"MR. WOLF. The language is 'represent adequately the entire community,' and what I want to try to make clear in the course of my presentation is that we are not going around looking for a hook to hang our case on.

"We expect to present to you a picture, and we think that each of these items will fit into the picture, and paint an image of racial discrimination.

"We think that one of the pieces that will be in that picture is the statutory context, which is that this committee, this panel, should represent adequately the entire community. We are not arguing that that means X number of whathaveyou; we are just saying that that is relevant.

"If it weren't there, maybe there would be a stronger argument to be made that you should not expect a large number of Blacks there, but it is supposed to represent adequately the entire community, and that means something. It doesn't mean anything

A reluctance by respondents to assert an independent claim that the charter requires racial balance on the whole Panel is not surprising if one focuses on the language of the charter itself. The only conceivably pertinent provision is § 12–206 (c):

> *"In order to represent adequately the entire community*, the four other members of the Educational Nominating Panel shall be appointed by the Mayor from the citizenry at large." (Emphasis added.)

As should be immediately apparent, the emphasized phrase, on which the dissent relies and which it apparently views as a requirement of racial balance, *speaks only to the four at-large seats.* The phrase does not address the nine seats restricted to the head of designated categories of citywide organizations and thus plainly does not address the Panel "as a whole." Thus, assuming the language is capable of carrying the meaning that the dissent would import to it and overlooking the fact that respondents did not set it out as an independent ground in their complaint or elsewhere, the provision is simply incapable of resolving a lawsuit addressed at all 13 seats on the Panel. As the District Court noted, "failing to appoint at-large members to adequately represent the entire community [is] not relevant in determining whether racial discrimination was involved with the appointments [to the Panel] . . . ." 333 F. Supp., at 1207.[22]

---

exactly, but it means something. It points you in a direction to suggest that you should find—

"THE COURT. And this is one of the sticks in the bundle that I should weigh.

"MR. WOLF. That's right. You should find some Blacks on there under the statute." Tr., Aug. 25, 1971, pp. 75–76.

[22] The dissent also refers to a statement by the chairman of the commission that drafted the Panel with regard to a "balanced cross section of the entire community . . . ." The statement by the

We also believe that the dissent's view of pendent jurisdiction as something akin to subject matter jurisdiction that may be raised *sua sponte* at any stage and that is capable of aborting prior federal court proceedings is a misreading of the law. "It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Mine Workers* v. *Gibbs*, 383 U. S. 715, 726 (1966). See 6 C. Wright & A. Miller, Federal Practice and Procedure 813 (1971). To argue that the doctrine requires us to wipe out three levels of federal court litigation of a federal law issue on the off chance that a peripheral state law claim might have merit ignores the Court's recognition that the doctrine's "justification lies in considerations of judicial economy, convenience and fairness to litigants . . . ." *Gibbs, supra,* at 726.[23]

---

chairman relied on by the dissent was coupled with the thought that one of the commission's principal purposes was to preserve the Mayor's accountability at the polls for his appointments. The commission apparently believed that the appropriate check on the Mayor's actions was the court of public opinion. Moreover, it is instructive to quote the chairman's statement. After noting that the Panel should serve as a substitute for public election of the School Board, the chairman said:

"It follows that the panel's composition should be so arranged in the charter that it can always constitute a balanced representation or cross-section of the people of the entire community—all of the community's ethnic, racial, economic, or geographic elements and segments."

To convert that statement, as would the dissent, into nothing more than a mandate for racial balance between Negroes and whites is to disregard wholly what the chairman actually said.

[23] Assuming, *arguendo,* that there is substance to the state claims perceived by the dissent, there would still be serious question about the appropriateness of pendent jurisdiction. The dissent concedes that "the sufficiency of the evidence to support [respondents' federal case] is arguable . . . ." *Post,* at 644. The dissent is, therefore, urging avoidance by a district court of a federal claim in favor of

The dissent suggests in the alternative that the District Court be directed to abstain while the parties start this case all over again in state courts. This proposal comes nearly three years after the filing of the complaint and would produce delay attributable to abstention that the Court in recent years has sought to minimize. See, e. g., *England* v. *Medical Examiners*, 375 U. S. 411, 425–426 (1964) (DOUGLAS, J., concurring). And abstention would be pointless since the state issues put forward by the dissent are plainly insufficient to merit such treatment. Moreover, the dissent's theme of the "paramount concern of avoiding constitutional questions, where possible . . ." strikes a particularly jarring note in a civil rights case in which the plaintiffs asserted that "the single issue . . . is whether there has been racial discrimination in violation of the Fourteenth Amendment . . . ." Although we have no occasion to decide the issue here, there is substantial authority for the proposition that abstention is not favored in an equal protection, civil rights case brought as was this one under 42 U. S. C. § 1983 and 28 U. S. C. § 1343.[24]

state law matters in a case where the federal issue is dubious yet is the only basis for federal jurisdiction. This amounts to an argument that the state tail should wag the federal dog, e. g., H. Hart & H. Wechsler, The Federal Courts and the Federal System 925 (2d ed. 1973), and we do not view it as an efficacious application of the pendent jurisdiction doctrine. *Alma Motor Co.* v. *Timken Co.*, 329 U. S. 129 (1946), on which the dissent relies in concluding that this case should be remanded for resolution of state issues, was a case in which the alternative ground for decision was a *federal* statute over which a district court would have jurisdiction without regard to the presence of federal constitutional issues. It plainly is not in point here. In the instant case, the alternative ground championed by the dissent is not by itself capable of conferring federal jurisdiction.

[24] See, e. g., *McNeese* v. *Board of Education,* 373 U. S. 668 (1963); *Harrison* v. *NAACP,* 360 U. S. 167, 180 (1959) (DOUGLAS, J., joined

We are in general accord, of course, with the dissent's view of the importance of the constitutional decision-avoidance principles articulated by Mr. Justice Brandeis in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 345–348 (1936). But those standards are susceptible of misuse.[25] And we think that to commence relitigation of this case on an insubstantial state issue abandoned by the parties would be a serious abuse of the *Ashwander* standards. There simply is not "present some other ground upon which the case may be disposed of." *Id.,* at 347.

The judgment is reversed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT
*Philadelphia Home Rule Charter*

### ARTICLE XII
### PUBLIC EDUCATION

---

#### CHAPTER 1
### THE HOME RULE SCHOOL DISTRICT

Section 12–100. The Home Rule School District.

A separate and independent home rule school district is hereby established and created to be known as "The School District of Philadelphia."

Section 12–101. The New District to Take Over All Assets and Assume All Liabilities of the Predecessor School District.

---

by Warren, C. J., and BRENNAN, J., dissenting); ALI Study of the Division of Jurisdiction Between State and Federal Courts § 1371 (g), commentary at 297 (1969).

[25] See Gunther, The Subtle Vices of the "Passive Virtues"—A Comment on Principle and Expediency in Judicial Review, 64 Col. L. Rev. 1, 16–17 (1964).

The home rule school district shall

(a) succeed directly the now existing school district for all purposes, including, but not limited to, receipt of all grants, gifts, appropriations, subsidies or other payments;

(b) take over from the now existing school district all assets, property, real and personal, tangible and intangible, all easements and all evidences of ownership in part or in whole, and all records, and other evidences pertaining thereto; and

(c) assume all debt and other contractual obligations of the now existing school district, any long term debt to be issued, secured and retired in the manner now provided by law.

CHAPTER 2
## THE BOARD OF EDUCATION

Section 12–200. The Board Created; Its Function.

There shall be a Board of Education of the School District of Philadelphia which shall be charged with the administration, management and operation of the home rule school district.

Section 12–201. Members of the Board; Method of Selection.

There shall be nine members of the Board of Education who shall be appointed by the Mayor from lists of names submitted to him by the Educational Nominating Panel....

Section 12–202. Eligibility for Board Membership.

Members of the Board of Education shall be registered voters of the City. No person shall be eligible to be appointed . . . to more than two full six-year terms.

Section 12–203. Terms of Board Members.

The terms of members of the Board of Education shall begin on the first Monday in December and shall be six

years except that (1) of the first members of the Board appointed . . . , three shall be appointed . . . for terms of two years, three for terms of four years, and three for terms of six years . . . .

Section 12–204.  Removal of Members of the Board.

Members of the Board of Education may be removed as provided by law.

Section 12–205.  Vacancies on the Board.

A vacancy in the office of member of the Board of Education shall be filled for the balance of the unexpired term in the same manner in which the member was selected who died or resigned.  If a member of the Board is removed from office, the resulting vacancy shall be filled as provided by law.

Section 12–206.  Educational Nominating Panel; Method of Selection.

(a) The Mayor shall appoint an Educational Nominating Panel consisting of thirteen (13) members. Members of the Panel shall be registered voters of the City and shall serve for terms of two years from the dates of their appointment.

(b) Nine members of the Educational Nominating Panel shall be the highest ranking officers of City-wide organizations or institutions which are, respectively:

(1) a labor union council or other organization of unions of workers and employes organized and operated for the benefit of such workers and employes,

(2) a council, chamber, or other organization established for the purpose of general improvement and benefit of commerce and industry,

(3) a public school parent-teachers association,

(4) a community organization of citizens established for the purpose of improvement of public education,

(5) a federation, council, or other organization of non-partisan neighborhood or community associations,

(6) a league, association, or other organization established for the purpose of improvement of human and inter-group relations,

(7) a non-partisan committee, league, council, or other organization established for the purpose of improvement of governmental, political, social, or economic conditions,

(8) a degree-granting institution of higher education whose principal educational facilities are located within Philadelphia, and

(9) a council, association, or other organization dedicated to community planning of health and welfare services or of the physical resources and environment of the City.

(c) In order to represent adequately the entire community, the four other members of the Educational Nominating Panel shall be appointed by the Mayor from the citizenry at large.

(d) In the event no organization as described in one of the clauses (1) through (9) of subsection (b) exists within the City, or in the event there is no such organization any one of whose officers is a registered voter of the City, the Mayor shall appoint the highest ranking officer who is a registered voter of the City from another organization or institution which qualifies under another clause of the subsection.

(e) A vacancy in the office of member of the Educational Nominating Panel shall be filled for the balance of the unexpired term in the same manner in which the member was selected who died, resigned, or was removed.

(f) The Educational Nominating Panel shall elect its own officers and adopt rules of procedure.

Section 12–207. The Educational Nominating Panel; Duties and Procedure.

(a) The Mayor shall appoint and convene the Educational Nominating Panel (1) not later than May twenty-fifth of every odd-numbered year, and (2) whenever a vacancy occurs in the membership of the Board of Education.

(b) The Panel shall within forty (40) days submit to the Mayor three names of qualified persons for every place on the Board of Education which is to be filled. If the Mayor wishes an additional list of names, he shall so notify the Panel within twenty (20) days. Thereupon the Panel shall within thirty (30) days send to the Mayor an additional list of three qualified persons for each place to be filled. The Mayor shall within twenty (20) days make an appointment . . . .

.        .        .        .        .

(d) The Educational Nominating Panel shall invite business, civic, professional, labor, and other organizations, as well as individuals, situated or resident within the City to submit for consideration by the Panel the names of persons qualified to serve as members of the Board of Education.

(e) Nothing herein provided shall preclude the Panel from recommending and the Mayor from appointing or nominating persons who have previously served on any board of public education other than the Board of Education created by these charter provisions.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, and with whom MR. JUSTICE DOUGLAS joins in Part II, dissenting.

I

Although the majority describes the "gravamen" of the respondents' complaint as grounded on the Equal

Protection Clause of the Fourteenth Amendment, respondents equally contended that the racially discriminatory appointment of members to the Educational Nominating Panel violated "the express provisions and intended purpose of the Educational Supplement" to the Philadelphia Home Rule Charter.[1] The action sought injunctive and declaratory relief under 42 U. S. C. § 1983, and jurisdiction was invoked under 28 U. S. C. § 1343 (3).

The District Court, after trial at which evidence was developed on both the constitutional and state claims, decided the constitutional claim adversely to the respondents. As to the state claim, the court stated:

"Further, plaintiffs would have us construe Section 12–206 (c) of the Educational Supplement to hold that the phrase 'representative of the community' refers to racial balance. However, the interpretation of this statute would more properly be decided by the State courts, and we take no position thereto."[2] *Educational Equality League* v. *Tate,* 333 F. Supp. 1202, 1206–1207 (ED Pa. 1971).

---

[1] This was a "short and plain statement of the claim," and was a general assertion that there had been racially discriminatory appointments in violation of the Charter. As the Court stated in *Conley* v. *Gibson,* 355 U. S. 41, 48 (1957), "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." A fair reading of the complaint shows that this general claim was supported by allegations of racial discrimination in the body of the complaint and that other violations of the Supplement were asserted "[i]n addition" to the allegations of racial discrimination.

[2] As to another subsidiary state law point, the court stated:

"Similarly, while it is clear that the Mayor has not appointed the chief executive officer of the various organizations selected for representation on the Panel as required by the Educational Supplement,

The Court of Appeals reversed on the constitutional ground, noting that "[i]n view of the result reached on plaintiffs' federal claims, the district court declined to exercise pendent jurisdiction over plaintiffs' claim that the Mayor had also violated state law—namely, various provisions of the Educational Supplement—in selecting Panel Members." *Educational Equality League* v. *Tate,* 472 F. 2d 612, 616 n. 15 (CA3 1973).

Although the court did not directly reach the state claim, it thought that the legislative history of the Educational Supplement "serves as the background for the facts of which plaintiffs complain," *id.,* at 615, particularly the evidence that the chairman of the Educational Home Rule Charter Commission, which drafted the Educational Supplement, contemplated that the composition of the Panel would "constitute a balanced representation or cross-section of the people of the entire community—all of the community's ethnic, racial, economic, or geographic element and segments." *Id.,* at 614–615.

There is no question in this case that the District Court had jurisdiction over this § 1983 action under § 1343 (3), since the equal protection claim was clearly substantial. *Hagans* v. *Lavine, ante,* p. 528. It is equally clear that if the pendent claim were a federal statutory one, the constitutional issue should not be reached if the statutory claim was dispositive. *Id.,* at 543. The statement of this principle in *Hagans,* and the cases on which it relied, *California Human Resources Dept.* v. *Java,* 402 U. S. 121, 124 (1971); *Dandridge* v. *Williams,* 397 U. S. 471, 475–476 (1970); *Rosado* v. *Wyman,* 397 U. S. 397, 402 (1970); *King* v. *Smith,* 392 U. S. 309 (1968), are ultimately premised on what has come to be known as the rule of necessity, of avoiding resolution of contro-

___

such violations have no bearing on the charges of racial discrimination and should also be decided by the State courts."

versies on constitutional grounds where possible. *Ashwander* v. *TVA,* 297 U. S. 288, 341 (1936) (Brandeis, J., concurring). Mr. Justice Brandeis stated the rule as follows:

> "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. . . . Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. *Siler* v. *Louisville & Nashville R. Co.,* 213 U. S. 175, 191; *Light* v. *United States,* 220 U. S. 523, 538." *Id.,* at 347.

In *Siler* v. *Louisville & Nashville R. Co.,* 213 U. S. 175 (1909), a state order regulating rates was attacked as unconstitutional, under the Fourteenth Amendment, on due process and equal protection grounds, as well as under Art. IV, § 4. The complaint also challenged the validity of the order under a state statute. The Circuit Court had invalidated the state regulation on equal protection and due process grounds. This Court began by noting that there was no question of the federal court's jurisdiction by virtue of the federal questions. The Court, however, invalidated the regulation on state grounds, declaring this preferable to an unnecessary determination of federal constitutional questions:

> "Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons. In this case we think it much better to decide it with regard to the question of a local nature, involving the construction of the state statute and the authority therein given to the commission to make the

order in question, rather than to unnecessarily decide the various constitutional questions appearing in the record." 213 U. S., at 193.

This course was taken despite the fact that the Court was without benefit of a construction of the statute by the highest state court of Kentucky. *Id.*, at 194. This method of adjudication "avoids decision of constitutional questions where possible, and it permits one lawsuit, rather than two, to resolve the entire controversy." C. Wright, Federal Courts 63 (2d ed. 1970). See H. Hart & H. Wechsler, The Federal Courts and the Federal System 922 (2d ed. 1973).

The policy of directly proceeding to a local law issue to avoid deciding a constitutional question, ruled upon in *Siler,* and which achieved doctrinal status in *Ashwander,* is "well settled." *Hillsborough* v. *Cromwell,* 326 U. S. 620, 629 (1946). Since the District Court and Court of Appeals passed by the state law claim, and directly proceeded to the federal constitutional issue, I would vacate the judgment of the Court of Appeals and remand to the District Court for assessment of the state law claim.[3]

The basic relief sought by respondents was to bar the 1971 Panel appointed by Mayor Tate from submitting nominees for the Board to the Mayor, and an order directing the Mayor to appoint a Nominating Panel "fairly representative of the racial composition of the school community." This relief would be equally avail-

---

[3] This case raises entirely separate issues than were posed in *Mine Workers* v. *Gibbs,* 383 U. S. 715 (1966), where a state claim was pendent to a federal statutory claim. Under such circumstances, the *Ashwander* doctrine is inapplicable, since there is no federal constitutional claim, and once having decided the federal claim, upon which jurisdiction is premised, the court must determine whether it is proper to resolve the pendent state claim as well.

able as a remedy for violations by the Mayor of the Educational Supplement.

If the District Court had proceeded to the state law claim, it might have decided that it was without merit, or even perhaps frivolous, in which case it would, in any event, have been required to answer the constitutional question. Perhaps if this Court believed the state court claim were of a truly insubstantial nature, the suggestion for a remand might appear not to be worth the candle, and productive of unnecessary delay. I do not believe this to be the case, however.

The respondents' view of state law was that the Mayor, here with the assistance of Deputy Mayor Zecca, was required to compile a list of all organizations which qualified under the nine categories set up by the city charter, and from this group to select the chief executive officer of one of those organizations in each category with the view of achieving a balanced racial composition on the Panel as a whole. This view was supported by the fact that the chairman of the Educational Home Rule Charter Commission, which drafted the Supplement, stated that the composition of the Panel should constitute a balanced cross section of the entire community, on racial, as well as other grounds. Minutes from the meetings of the Charter Commission were relied upon to support this reading of the charter.

On the other hand, petitioner reads the charter quite differently. Deputy Mayor Zecca testified that the description of certain categories almost dictated which organization was to have representation on the Nominating Panel. Category one on the Nominating Panel required representation of "a labor union council or other organization of unions of workers and employes organized and operated for the benefit of such workers and employes." Mr. Toohey, the head of the AFL–CIO

in Philadelphia, was appointed to the position. When Deputy Mayor Zecca was asked whether there was any other organization in Philadelphia which would fit this general category, he replied, "I don't believe there is another organization that would fit that category to the extent that the AFL–CIO Council operates. This is the broadest possible group." Tr., Aug. 25, 1971, p. 206. Zecca was then asked about the second category which provides for "a council, chamber, or other organization established for the purpose of general improvement and benefit of commerce and industry." The Mayor had appointed the Philadelphian who was the chief ranking officer of the Chamber of Commerce and Industry. When asked why that appointment was made, Zecca stated: "Well, the Chamber of Commerce—I think the wording of the Charter makes it almost implicit that it is referring to the Chamber of Commerce, referring to the use of the word 'chamber.' I think that these restraints, the framers of that Home Rule Supplement practically did everything but dictate exactly who they wanted to serve in those nine categories." *Id.*, at 207.

Respondents and petitioner thus squarely joined issue on the intent of the charter.[4] Respondents thought any

---

[4] The general claim of discrimination was not abandoned at trial. As the transcript shows, the statutory claim remained "one of the pieces" in the "picture" of racial discrimination. After evidence was taken, respondents continued to press this claim in their post-trial brief, which stated:

"The evidence presented clearly demonstrates that the entire scheme of appointments violated the central principle of the Panel as expressed by the framers of the Supplement. It is clear from the documents introduced by the defendant that the Panel method of selecting School Board members was adopted after great consideration of a number of alternatives. It is equally clear that the Commission intended that the Panel mechanism function as a substitute for or counterpart of popular election; it should therefore

group fitting a given category should be put into a pool for that category, and then a particular group selected for each category with a view to achieving certain balances on the Panel as a whole. Evidently, the city's view was that the most representative group of the Philadelphia community in each category should be picked without regard to balancing the Panel as a whole. The balancing was already achieved through the diversity of types of organizations to be represented on the Panel. Of course, to the extent that any predominantly white group was more representative of the citizens of Philadelphia, as a whole, than any predominantly black group, this might work to minimize the number of blacks appointed to the Panel, assuming the chief executive officer of a group reflects its predominant racial composition. The resolution of this issue is far from clear, and should have been decided by the District Court without proceeding immediately to the constitutional claim.

The majority only comes to grips with the state law claim of racial discrimination in a footnote, stating: "The statement by the chairman relied on by the dissent was coupled with the thought that one of the commission's principal purposes was to preserve the Mayor's accountability at the polls for his appointments. The commission apparently believed that the appropriate check on the Mayor's actions was the court of public

---

constitute a balanced representation of the people of the entire community."

The statement of counsel at the opening of the trial obviously did not fully reflect or anticipate the evidence at trial or the issues tendered and accepted by the District Court. That court, rather than deciding the state law issues as part of the constitutional claim, expressly left them for resolution in the state courts. The fact that a state law claim is presented with a constitutional argument does not remove the claim as an alternative ground of decision.

opinion." *Ante,* at 626–627, n. 22. Whether the charter intended to confine the discretion of the Mayor is a matter of state law not passed upon by the two federal courts which have reviewed this case. I see no need for this Court, which is far away from the controversy at hand, to decide the merits of the state law claim, on the basis of its own reading of the charter. The state law claim should be left, in the first instance, to the District Court.[5]

As the majority opinion indicates, one of the grounds relied upon by the Court of Appeals in finding racial discrimination in the appointment of the Panel, under the Fourteenth Amendment, was the fact that Zecca was unaware of many black organizations and institutions set out in the city charter. Wholly aside from whether the "lack of awareness" might support an inference of racial discrimination, the Court of Appeals noted that Zecca thought that only particular organizations could qualify for appointment under various charter provisions. As I read his testimony, all Zecca claimed he had to know was that the Chamber of Commerce and the AFL–CIO were the most representative trade and labor groups in the city, which automatically dictated appointment of their representatives to the Panel. I take it that, under his view of the charter, it was not necessary to proceed further. If respondents' reading of the charter requirements were to prevail over that of petitioner's, a violation

---

[5] In arguing that the claim was insubstantial, the majority attacks a straw man. It assumes that the claim could only have been based on § 12–206 (c) of the charter, which relates to the selection of at-large members of the Panel. But the claim advanced by respondents was that the framers of the charter intended that the nine organizational seats on the Panel, selected under § 12–206 (b), when combined with the four at-large selections, represent a racial cross section of the community.

of the state law might well give rise to the relief requested.

Of course, the District Court on remand might decide that it should leave to the state courts resolution of the state law issue, and abstain. In such event, the proper course to follow would be to retain jurisdiction over the constitutional issue pending resolution of the state claim in another forum. The decision to abstain is by no means required and whether that course meets the test of "special circumstances," see *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498, 509 (1972), is far from certain. I raise this possibility only for the purpose of stressing that even if abstention were to be deemed appropriate, a question on which I indicate no view, the District Court should still refrain from deciding the constitutional issue. The paramount concern of avoiding constitutional questions, where possible, persists. The Court has noted that application of the abstention doctrine inevitably gives rise to delay and expense, *England* v. *Medical Examiners,* 375 U. S. 411, 418 (1964), but the policies underlying the *Ashwander* doctrine should prevail even at this late date in the litigation.

The bearing of the *Ashwander* doctrine was not raised by the parties to this litigation, either in the District Court, the Court of Appeals, or in this Court. However, this Court clearly has "the power to notice a 'plain error' though it is not assigned or specified," *Brotherhood of Carpenters* v. *United States,* 330 U. S. 395, 412 (1947), and this holds true whether the error has or has not been briefed or argued in this Court. *Silber* v. *United States,* 370 U. S. 717 (1962).

In *Alma Motor Co.* v. *Timken Co.,* 329 U. S. 129 (1946), the Court of Appeals had before it not only a constitutional question which it decided, but also a nonconstitutional question, which alone would have disposed

of the appeal. The Court of Appeals ruled on the constitutional question, and it appears that at no time did any party urge that court to rule on the statutory ground. This Court granted certiorari on the constitutional issue and heard argument at the October 1944 Term on the constitutional question. After the case had been set down for further argument in the 1945 Term, the United States, which was an intervenor in the action, pointed out that the case could be decided on statutory grounds, and moved to vacate the judgment of the Court of Appeals and to remand the case to it for determination of the statutory question. The Court adopted the suggestion of the United States, relying on *Siler* and stating:

> "This Court has said repeatedly that it ought not pass on the constitutionality of an act of Congress unless such adjudication is unavoidable. This is true even though the question is properly presented by the record. If two questions are raised, one of non-constitutional and the other of constitutional nature, and a decision of the non-constitutional question would make unnecessary a decision of the constitutional question, the former will be decided." *Id.,* at 136.

The presence of the nonconstitutional ground had not been raised below, or in this Court until after argument, but the Court observed:

> "We agree that much time has been wasted by the earlier failure of the parties to indicate, or the Circuit Court of Appeals or this Court to see, the course which should have been followed. This, however, is no reason to continue now on the wrong course. The principle of avoiding constitutional questions is one which was conceived out of considerations of

sound judicial administration. It is a traditional policy of our courts." *Id.*, at 142.

## II

Since the majority fails to accept my views on the matter of reaching the constitutional question, I feel compelled to express my thoughts on the merits of the claim of racial discrimination.

On the record in evidence before it, the Court of Appeals found that the 1971 Nominating Panel was discriminatorily chosen. Although the sufficiency of the evidence to support that conclusion is arguable, I would not substitute our own view of the facts and overturn the Court of Appeals' judgment in this respect. Negroes constituted 34% of the population, and 60% of the public school students were Negroes. The purpose of the ordinance establishing the Nominating Panel was to stimulate and invite participation by all groups in the community, including Negroes and other minorities. It is, therefore, especially significant, even from this distant vantage point, that despite the evident intent of the ordinance to have municipal authorities seek out city-wide associations and interest groups, the city official most responsible, short of the Mayor, for the composition of the Panel confessed ignorance of many of the organizations from which nominations to the Panel might have been made and which might have put forward meritorious suggestions for School Board membership. There was also highly probative evidence with respect to the Mayor's statement that he intended to appoint no more Negroes to the School Board. These facts, when seen through the eyes of judges familiar with the context in which they occurred, may have special significance that is lost on those with only the printed page before them. Sometimes a word, a gesture

or an attitude tells a special story to those who are part of the surrounding milieu. This is one of those situations, and I would not purport to reassess the facts and overturn the considered judgment of the Court of Appeals.

The Court complains that the testimony about the Mayor's statement concerning school membership for Negroes was inadmissible hearsay and was thus entitled to no credence. *Ante*, at 618 and n. 19. But nowhere in this record can one find a denial by Mayor Tate that he did not say what the testimony indicated. His declaration that he was not going to appoint any more Negroes to the School Board was a statement of future intention and as such was quite plainly admissible in evidence.

> "[W]henever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party.
>
> "The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact, as his own testimony that he then had that intention would be." *Mutual Life Insurance Co.* v. *Hillmon,* 145 U. S. 285, 295 (1892).

As an eminent commentator has observed:

> "[I]t is now clear that out-of-court statements which tend to prove a plan, design, or intention of the declarant are admissible, subject to the usual limitations as to remoteness in time and apparent sincerity common to all declarations of mental state, to prove that the plan, design, or intention of the

declarant was carried out by the declarant." C. Mc-Cormick, Evidence § 295, p. 697 (2d ed. 1972).

More importantly, the statement evidencing the Mayor's attitude toward Negroes and their appointment to the School Board was simply not hearsay. At the time that the challenged statement was assertedly made and when it was later related by the witness who saw the Mayor make it on television,[6] Mayor Tate was still in office and a party to the lawsuit. The statement was an admission on his part, and as such it was not hearsay. This elementary proposition of evidence law has most recently been recognized by the draftsmen of the Proposed Rules of Evidence for the United States Courts and Magistrates. Rule 801 (d)(2) expressly acknowledges that an admission by a party-opponent is not hearsay if the statement is offered against the party and was actually made by him in either his individual or representative capacity. The Advisory Committee's Note succinctly outlines the reasons justifying the rule:

"Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. Strahorn, A Reconsideration of the Hearsay Rule and Admissions, 85 U. Pa. L. Rev. 484, 564 (1937); Morgan, Basic Problems of Evidence 265 (1962); 4 Wigmore § 1048. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from the restrictive influences of the opinion rule and the

---

[6] Tr. of Oral Arg. 31.

> rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility."

The District Court, therefore, was in error in refusing to admit the Mayor's statement in evidence, and the Court of Appeals was correct in considering it and giving it the weight it deserved. Its conclusion was that the statement supported an inference that there was racial discrimination in the formation of the Nominating Panel. But this Court now says that the inference is not a strong one and is insufficient, along with the other evidence, to sustain the judgment. It is at precisely this point, however, that I would not profess superior insight as to the meaning of "local" facts and override the judgment of the Court of Appeals with respect to the issue of discrimination.

My disagreement with the Court does not go beyond what I consider its improvident exercise of a factfinding role in this particular case. I do not question the long-established principle that this Court has a special responsibility, if not an affirmative duty, to ensure by independent review of the facts that the Constitution is not frittered away.

> "This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 285 (1964).

Similarly,

> "That the question is one of fact does not relieve us of the duty to determine whether in truth a federal right has been denied. . . . If this requires

an examination of evidence, that examination must be made. Otherwise, review by this Court would fail of its purpose in safeguarding constitutional rights." *Norris* v. *Alabama,* 294 U. S. 587, 589–590 (1935).

The constitutional obligation of this Court, therefore, is to scrutinize a record in a case raising federal constitutional questions with detachment and circumspection, and always with an eye toward the impact of factual determinations on the federal right asserted.

But this has never been thought to be a license to rummage through a record looking for shreds of evidence that will discredit the judgment under review and suggest a contrary conclusion. Quite assuredly, reasonable men can, will, and often should differ as to questions of fact as well as law. Likewise, the records in many cases coming to this Court contain complicated, interwoven questions of what, have been designated as "law and fact." See H. Hart & H. Wechsler, *supra,* at 601–610. "[I]t is almost impossible[, however,] to conceive how this Court might continue to function effectively were we to resolve afresh the underlying factual disputes in all cases containing constitutional issues." *Time, Inc.* v. *Pape,* 401 U. S. 279, 294 (1971) (Harlan, J., dissenting).

In this case, two interrelated "factual" questions are presented: did the Mayor make the statement evidencing his attitude toward appointing Negroes to the School Board and, if so, is the inference strong enough to support the judgment of the Court of Appeals? The District Court apparently assumed the statement was made, but ruled it inadmissible hearsay that the court should not consider. The Court of Appeals, however, accepted the making of the statement and reached the conclusion, based on the statement, that "[i]f the Mayor decided, prior to receiving nominees from the Panel to exclude

black nominees from consideration, an inference may be drawn that the Mayor in similar manner excluded blacks from consideration as members of the 1971 Panel." 472 F. 2d, at 616 n. 9. The Court apparently disagrees with the unanimous Court of Appeals' assessment that the statement was ever made, but surely this is not the type of historical fact that should command this Court's attention, at least absent some unusually extraordinary or complicating factors. As for the second issue—whether the inference was strong enough to support the judgment of racial discrimination—I fail to see how we are better equipped for this determination than our counterparts on the Court of Appeals.

The District Court, having failed to consider the case with the Mayor's statement in evidence, provides no crutch for this Court. If the District Court's assessment of the presence of racial discrimination is deemed a critical factor, the proper course would be to remand the case to the District Court, rather than to reject, on its own motion, the weight given to that testimony by the Court of Appeals. In *United States* v. *Matlock, ante,* at 177–178, where we determined that the District Court had erroneously excluded evidence as hearsay, we determined the evidence should be admitted, but remanded the case to the District Court to determine what weight should be given to the evidence. In the present posture of this case the Court is in no position to rely on any view of the relevant and admissible facts other than its own.

I am also unconvinced that we must reverse every ultimate factual conclusion of the courts of appeals whenever we disagree with them or simply because we would not have arrived at the same conclusion had we been deciding the issue in the first instance. Where ample evidence supports the court of appeals' judgment and reasonable

men could make different assessments of the facts, there is room for deferring to the court of appeals. This is especially true where its judgment rests on "an intensely local appraisal" of the facts "in the light of past and present reality . . . ." *White* v. *Regester,* 412 U. S. 755, 769–770 (1973).

I must dissent.[7]

---

[7] I do agree with the Court that the remedy against the incumbent Mayor Rizzo was improvident. See *Spomer* v. *Littleton,* 414 U. S. 514 (1974).