James R. and Janice E. HARPER,
Plaintiffs,

v.

The UNION SAVINGS ASSOCIATION,
Defendant.

No. C 75–671.

United States District Court,
N. D. Ohio, E. D.

March 14, 1977.

Avery S. Friedman, David L. Hoehnen, Cleveland, Ohio, for plaintiff.

Fred W. Friend, Timothy F. McMahon, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

### WILLIAM K. THOMAS, District Judge.

On April 10, 1974, Union Savings Association (hereafter Union) filed its action to foreclose its mortgage note and deed issued to James R. Harper and Janice E. Harper (hereafter the Harpers). Union had made a 90% loan to finance the Harpers' purchase of a residence on Rawnsdale Road in Shaker Heights, Ohio, title to the property having been recorded in the Harpers' name on October 20, 1972. On May 28, 1975, Judge Lloyd O. Brown of the Common Pleas Court of Cuyahoga County, after a hearing, overruled the Harpers' motion to stay the sale proceedings.[1] At the sheriff's sale Union bought in the property. On June 24, an order for writ of possession issued to the sheriff, the Harpers having continued to reside in the property throughout the foreclosure proceedings.

---

1. The Court: Gentlemen, I listened attentively and, of course, I have read this file over and over again. In addition, when this motion was filed I turned it over to the law clerk to check some pertinent issues of fact and also some law in reference to this type of case.

This is a simple foreclosure where Mr. and Mrs. Harper did not make their payments based upon the contract they signed in this particular matter.

And in listening this morning, I find that in addition to the amount of money that was due in October of 1974, there has been an additional incurrence of amounts due and there is presently due today, by a mathematical calculation, $6,235.00 based upon the fact, if the fact is that they owe $4104 on October 1, 1974 and there have been seven other months at $307.00 a month, something like that, a little over $6,000.00.

This Court hates to see anybody lose their property for any reason whatsoever, but we have here a case that has been through this Court, through the Referee, and there is claim that the defendants did not pay their mortgage payments because of some extraneous thought that they were not sure that they owned the property. This may be true, but if they felt that, that money should be available now, and if that money were available to pay the Union Savings to bring this account current, then the Court would see it that way. But there is no money to bring this account current, Mr. Snipes, and based upon the posture of this lawsuit I have stayed proceedings to this day, but I no longer can stay them any further. The sale will go on on the 9th day of June.

The day before the sheriff was to dispossess the Harpers, they filed this action on July 30, 1975. They sought

> . . . to enjoin racial discrimination in housing as it relates to mortgage credit as prohibited by the Fair Housing Act of 1968, 42 U.S.C. Sections 3601, *et seq.* and by the Civil Rights Act of 1866, 42 U.S.C. Sections 1981 and 1982 and by regulations issued by the Federal Home Loan Bank Board, 12 C.F.R. 528 and 531.

Jurisdiction was invoked in this court pursuant to 28 U.S.C. §§ 1343(3) and (4) and 2201, and 42 U.S.C. §§ 3612 and 3617.

On the same date, July 30, 1975, this court conducted a hearing upon plaintiffs' request to temporarily restrain the eviction of the Harpers and their children. The court being informed that the Harpers had found a place in which to move that had not yet opened up, a temporary order restraining the eviction of the Harper family was issued for 14 days. On August 14, 1975, the Harpers vacated the premises. An amended complaint was filed the next day, adding a prayer for damages.

In paragraphs 4, 5, and 6 the plaintiff Harpers allege that they are black persons and citizens of the United States; that defendant Union is a lending institution pursuant to section 805 of the Fair Housing Act, 42 U.S.C. § 3605; and that

> Plaintiffs and defendant entered into a mortgage for the purchase of a residential dwelling in October, 1972 on an all white street in Shaker Heights, Ohio.

Answering, defendant Union admits that it is a lending institution subject to the provisions of section 805 of the Fair Housing Act. It further admits the execution of a note and mortgage relating to the purchase of the residential property located at 3652 Rawnsdale Road, Shaker Heights, Ohio, but denies the allegation that this was "an all white street."

In paragraph 7 the plaintiffs allege that "[t]wice in 1973 [their] checks for monthly payments were not covered by sufficient funds, but plaintiffs took immediate action to cover the payments after notice." While admitting the dishonored checks for insufficient funds, Union denies that "plaintiffs took immediate action to cover payments after notice."

Paragraph 8 alleges that James Harper, in the fall of 1973, "lost his employment and attempted to negotiate interim financing of the dwelling with the defendants;" and paragraph 9 states that "[a]lthough institutions usually attempt to accommodate mortgagors under such circumstances, all proposals were rejected."

Answering paragraph 8, defendant Union states it is without knowledge as to James Harper's unemployment in the fall of 1973, and "otherwise denies that plaintiffs realistically attempted to negotiate interim financing with defendant." Paragraph 9 is denied, "as constituting argumentative and erroneous conclusions."

In paragraph 10, plaintiffs state that they "sent defendants periodic balances in order to make up mortgage payment deficiencies;" and defendant Union, while admitting some periodic payments, states that "same were insufficient to satisfy the [Harpers'] obligations."

Remaining paragraphs 11 through 20 of plaintiffs' amended complaint, the allegations of which defendant Union denies, are as follows:

11. Defendant was advised of plaintiff's new employment in January, 1974 and of his capacity to resume regular payment.

12. When defendant sought foreclosure in April, 1974, plaintiff was in arrears in the amount of only one (1) month's payment.

13. In plaintiffs' belief, defendant's action was taken on account of race.

14. Defendant's pursuit of foreclosure against blacks living in integrated or predominantly black areas is not as aggressive or vigorous.

15. Defendant's pursuit of foreclosure against whites living in predominantly white areas is not as aggressive or vigorous.

16. Defendant has interfered with plaintiffs' fundamental rights of equal housing opportunities in their summary rejec-

tions of accommodations and aggressive pursuit of foreclosure.

17. Subsequent to the foreclosure order, plaintiffs have offered and continue to offer proposals in order to arrange financing with the defendant to remain in their home.

18. Defendant refused and continues to refuse to negotiate any proposal to date.

19. As a proximate result of the discriminatory conduct of the defendant and its agent, plaintiffs have suffered great humiliation, anxiety, and outrage, along with a substantial loss of personal funds.

20. Plaintiffs are unable to afford legal services in vindicating their rights under federal fair housing statutes FHLBB regulations.

The case has now been tried at length upon the merits. It is imperative to first consider and determine defendant's defense that "plaintiffs' complaint fails to state a claim upon which relief can be granted;" and its defense that "plaintiffs' alleged cause of action is barred by the provisions of the applicable statute of limitations, 42 U.S.C. § 3612." In part I which follows, these two defenses will be considered in that order.

## I.

### A.

The Thirteenth Amendment empowers Congress to eliminate all badges and incidents of slavery. Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601, *et seq.* is an exercise of that power. *Williams v. Matthews Co.*, 499 F.2d 819, 825 (8 Cir. 1974); *United States v. Hunter*, 459 F.2d 205 (4 Cir. 1972). Among the several sections upon which plaintiffs predicate their cause of action against defendant Union, 42 U.S.C. § 3605 alone specifically defines duties that are imposed upon lending institutions. Defendant Union admits that for the purposes of this action it is "subject to the provisions of Section 805 of the Fair Housing Act, 42 U.S.C. Sec. 3605." Entitled "Discrimination in the financing of housing", that section provides:

After December 31, 1968, it shall be unlawful for any bank, building and loan association, . . . to deny a loan or other financial assistance to a person applying therefor, for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, or national origin of such person . . . or of the present or prospective owners . . . of the dwelling . . . in relation to which such loan or other financial assistance is to be made or given.

Obviously, there is no express language in section 3605 that prohibits discrimination in the manner in which a lending institution exercises its equitable right to foreclose a delinquent mortgage loan. However, Congress has expressly made it unlawful for a lending institution to deny a loan "because of the race, color, religion, sex, or national origin" of a prospective owner of "the dwelling . . . in relation to which such loan . . . is to be made or given"; and Congress has further made it unlawful to discriminate against such person in the fixing of "terms or conditions of such loan".

The unqualified words "terms or conditions" are entitled to the broadest possible construction; and a mortgage loan is, therefore, found to be within the contemplation of such language. Presumably the mortgage deed executed by the Harpers to Union is a standard mortgage deed. Contemplating the eventuality of foreclosure it provides in paragraph 6 that "if proceedings be brought to foreclose this mortgage or to collect the principal and interest represented by the note hereinbefore recited, a court of competent jurisdiction, . . . may appoint a receiver to take possession of, manage and control said premises . . . ." This court concludes that it is the intent of Congress that section 3605's prohibitions against discrimination on the part of lending institutions in connection with real estate loans proscribe discrimina-

tion in the manner in which a lending institution forecloses a delinquent or defaulted mortgage note since the right of foreclosure is one of the "terms or conditions of such loan".

Broad construction of section 3605 is in keeping with the Supreme Court's recognition in *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972), that "the language of [the Fair Housing Act] is broad and inclusive." Similarly, *Marr v. Rife*, 503 F.2d 735, 740 (6 Cir. 1974), declares:

> An examination of the Act, 42 U.S.C. §§ 3601–3612, reveals a broad legislative plan to eliminate all traces of discrimination within the housing field.

The question of whether a racially discriminatory foreclosure is a violation of 42 U.S.C. § 3605 has apparently only been an issue in two other reported cases. *Hunter v. Atchinson*, 466 F.2d 490 (6 Cir. 1972); *Lindsey v. Modern American Mortgage Corp.*, 383 F.Supp. 293 (N.D.Tex.1974). The court of appeals in *Hunter* was not specifically presented with the question of whether the plaintiff had stated a Title VIII cause of action in his allegation of the defendant's racially discriminatory "policy of tolerance" in mortgage foreclosure. The court did, however, remand the case for further consideration of whether the 180-day limitation period of Title VIII had been met, thus implicitly finding that plaintiff had stated a claim upon which relief could be granted. Judge Robert Porter in *Lindsey* was directly presented with this same question and held that a claim had been stated under Title VIII. Thus the only judicial authority on point is in accord with this court's holding.

While the authority and responsibility for administering the Fair Housing Act is lodged in the Secretary of Housing and Urban Development (42 U.S.C. § 3608(a)), subsection c of section 3608 provides:

> All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this subchapter

and shall cooperate with the Secretary to further such purposes.

As an executive agency the Federal Home Loan Bank Board (hereinafter FHLBB) is required by section 3608(c) to administer its program and activities relating to "housing and urban development in a manner affirmatively to further the purposes of this subchapter". Building and loan associations, either federally chartered or state associations whose deposits are federally insured (such as Union), are deemed subject "to such inspection and regulation as the [FHLBB] shall prescribe" (12 U.S.C. § 1424(a)); and are, therefore, subject to regulations adopted by the FHLBB pursuant to its power granted by 12 U.S.C. § 1437(a).

Pursuant to its powers, and in carrying out its responsibilities under section 3608(c), *supra*, the FHLBB has issued 12 C.F.R. § 528.2, "nondiscrimination in lending and other services." While tracking the language of section 3605, section 528.2(a) also represents the FHLBB's interpretation of the meaning of section 3605. In pertinent part, section 528.2(a) provides:

> No member institution shall deny a loan or other service rendered by the member institution for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or discriminate in the fixing of the amount, interest rate, duration, application procedures, *collection or enforcement procedures*, or other terms or conditions of such loan or other service because of the race, color, religion, sex, or national origin of
>
> \*    \*    \*    \*    \*    \*
>
> (3) The present or prospective owners . . . of the dwelling . . . in relation to which such loan or other service is to be made or given; . . . .
> [Emphasis added.]

The emphasized language coincides with this court's construction of section 3605, as previously explained. In short, section 3605 prohibits discrimination because of race, color, religion, sex, or national origin in a lending institution's exercise of collection or enforcement procedures which, of course,

include the filing and prosecution of a foreclosure action. Under this construction of section 3605, the court concludes that the plaintiffs have sufficiently alleged a cause of action under section 3605. The quoted allegations of plaintiffs' amended complaint, particularly paragraphs 14 through 19, *supra* at 1256, are deemed to sufficiently state a cause of action under section 3605 as thus interpreted. Having found section 3605 specifically applicable it is unnecessary to determine whether the plaintiffs' amended complaint also states a cause of action severally under sections 804(a) or 817, 42 U.S.C. §§ 3604(a) or 3617, or the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 or 1982.

### B.

Defendant Union also asserts, as a defense, that plaintiffs' "alleged cause of action is barred by the provisions of the applicable statute of limitations, 42 U.S.C. Section 3612." Section 3612 provides a period of limitation of 180 days from the time the discriminatory housing practice occurred for the filing of a lawsuit in federal court. In advancing this defense, Union's counsel points to the testimony of plaintiff James R. Harper that Union's discrimination against him began with a letter of April 20, 1973, from the bank's attorney, C. H. Royon.[2] Harper cited the attitudes of Robert Asmondy, assistant manager, loan service department, and W. P. Sulik, vice president, loan service department. He testified that there was discrimination when he offered payment and it was refused, and when Union foreclosed he expected Judge Brown (of the Cuyahoga County Court of Common Pleas) to hear the facts and make a just decision. Union argues that plaintiffs' cause of action, as alleged, commenced at the very latest upon Union's filing of the foreclosure action on April 10, 1974. Hence it urges that the 180-day period of limitation expired before the commencement of this action on July 30, 1975.

However, plaintiffs do not single out any one act of defendant Union as comprising their cause of action. Instead, they say, the wrongful violation of section 3605 consists of a series of acts that began with the Royon letter of April 20, 1973, and continued up to and including the Harpers' eviction from their former home as a result of the writ of possession issued pursuant to the precipe of defendant Union.

■ In the original complaint plaintiffs requested that this court permanently enjoin "the defendant from discriminating on account of race in the terms and conditions of mortgage arrangement, including any disparity on account of race in the pursuit of mortgage foreclosure." While limiting its grant of injunctive relief to a restraint of the eviction of the Harper family for a two-week period, the court thus recognized that Union's request for dispossession of the Harpers was part of the continuing injury alleged by the plaintiffs. At the same time plaintiff Harper was told

The only kind of relief that it seems to me that is possible here in this lawsuit is, in effect, a suit for damages and a claim for damages, if indeed, you can prove what counsel have put into your complaint: that based on racial discrimination, you have been treated improperly.

It is concluded, therefore, that the wrongful violation of section 3605 which plaintiffs

---

**2.** The letter from Mr. Royon reads as follows:

Re: H–1–1034

Dear Mr. & Mrs. Harper:

Please be advised that your mortgage with the Union Savings Association has been turned over to me as counsel because the loan is delinquent, and you have defaulted in the terms and conditions of the note evidencing the loan and mortgage securing it. Payment in full is, therefore, due immediately.

Failure on your part to pay this loan in full, either by refinancing it with another institution or by other means on or before April 24, 1973 will mean that I shall be forced to commence foreclosure action, which will increase the charges against your loan obligation to The Union Savings Association by reason of court costs and title report fees.

If you have any legal or legitimate reason why the above course of action should not be taken, contact Mr. R. Asmondy at the Union Savings Association's Main Office, One Terminal Tower, in person, no later than the above date.

Very truly yours,

/s/ C. H. Royon

allege is a species of tort involving a continuing injury. It is generally recognized that "when a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." *Donaldson v. O'Connor*, 493 F.2d 507, 529 (5 Cir. 1974),[3] *vacated and remanded* (for reconsideration of jury instructions in light of *Wood v. Strickland*, 420 U.S. 308, 96 S.Ct. 992, 43 L.Ed.2d 214 (1975), 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

■ Under the foregoing analysis the plaintiffs' cause of action, as alleged in their amended complaint, is deemed to have arisen on July 31, 1975, the date upon which the plaintiffs would have been dispossessed by virtue of the defendant's order of foreclosure but for this court's temporary restraint upon the execution of the state court writ of possession. Hence, the cause of action of the plaintiffs was filed within the 180 days allowed by 42 U.S.C. § 3612. Having overruled defendant Union's two separate defenses, it is agreed, as argued by the United States in its brief *amicus curiae*, that "these plaintiffs have a right to prove their case, and the action should not be dismissed."

## II.

### A.

Union has retained in its files collection chase cards involving 7300 mortgage accounts. A collection chase card is opened and maintained whenever a mortgage account becomes delinquent. An account becomes delinquent under Union mortgage notes at the expiration of the 15-day grace period following the due date of the monthly instalment. A late charge not to exceed 8 per cent may be charged on such delinquency. The basic purpose of the chase card is to record arrangements for payment and for use as a follow-up of promises to pay. It is preferable, according to Mr. Asmondy, to contact the customer by telephone or in person. Examination of the chase cards in evidence shows that a brief entry of each telephone conversation or personal conversation, using speedwriting letters and signs, is recorded on the chase card. Once an account is paid in full the chase card is pulled. Chase cards with relatively few entries are destroyed but chase cards reflecting lengthy delinquencies are retained.

While Union had outstanding 15,000 to 16,000 mortgage accounts during each of the years 1974, 1975, and 1976, the chase cards actively being worked upon approximated 300 in 1974, with an increase of 25 to 50 in the next two years.

Counsel for the plaintiffs, under a protective order limiting use of information to this case, have been permitted to examine the 7300 collection chase cards. The court allowed this exhaustive and tedious search of Union's records to enable plaintiffs' counsel to identify and isolate histories of mortgage accounts that might support these critical allegations of the Harpers' amended complaint:

12. When defendant sought foreclosure in April, 1974, plaintiff was in arrears in the amount of only one (1) month's payment.

13. In plaintiffs' belief, defendant's action was taken on account of race.

14. Defendant's pursuit of foreclosure against blacks living in integrated or predominantly black areas is not as aggressive or vigorous.

15. Defendant's pursuit of foreclosure against whites living in predominantly white areas is not as aggressive or vigorous.

Contrary to paragraph 12, the evidence shows and the court finds that on April 10, 1974, the day upon which defendant Union

---

3. *Cooper v. United States*, 442 F.2d 908, 911 (7 Cir. 1971) observes:

It is true that the statute of limitations does not always begin to run at the first moment where a wrongful invasion of a protected interest might give rise to a cause of action. In such cases, the specific circumstances of the case may lead the court to suspend operation of the statute and effectively toll its passage by postponing or continuing its inception. See generally Developments in the Law—Statutes of Limitations, 63 Harv.L. Rev. 1177, 1200–1207 (1950).

commenced the foreclosure action, the Harpers owed six monthly payments of $307 (November, December of 1973, and January, February, March, and April of 1974). In addition, they owed closing costs of $150.64 (itemized in the escrow statement of October 25, 1972) plus certain late charges. Hence on April 10, when defendant Union by letter returned to the Harpers their "most recent remittance in the amount of $1,456.32," this amount covered four delinquent monthly installments and closing and late charges. Actually six monthly installments were then owed. But it still remains to determine whether paragraphs 13, 14, and 15 have been supported by sufficient proof in light of the entire record.

To support the plaintiffs' claim of selective foreclosure forbearance plaintiffs' counsel announced an intention at the outset of the trial to offer 48 chase cards. Thereupon the court requested plaintiffs' counsel to restrict the offer to the most severe cases; and plaintiffs' counsel then tendered 11 mortgage histories. Seven of these involve white mortgagors living in either all white or predominantly white neighborhoods. Three of the 11 mortgagors involve blacks who lived in either all black neighborhoods or predominantly black neighborhoods. The 11th mortgagor was a black couple who purchased a house on Strathavon Road, Shaker Heights in February 1967, at a time when the neighborhood was predominantly white. These chase cards, received into evidence over the objection of defendant Union, represent only .0015 percent of the universe of 7300 chase cards. This sampling is too small to permit a drawing of any reliable statistical inferences from defendant Union's foreclosure forbearance practices based on the race of the mortgagor and the racial composition of the neighborhood of the subject property. *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620–21, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). Moreover, examination of the mortgage histories reveals sufficient differences in the events and data of each history to cast doubt on the ability to quantify measurably the histories. Nevertheless, since the 11 mortgage histories provide some evidence of the foreclosure forbearance practices of defendant Union, these histories will be considered together with the Harper mortgage history in determining plaintiffs' claim.

### B.

Plaintiffs stress the letter of April 20, 1973, written to them by C. H. Royon, attorney for defendant Union, as the principal first act of Union that comprises plaintiffs' cause of action against defendant Union. This letter, *supra*, n.2, contains the standard language of Union's "No. 5 letter," the stiffest letter (on a 1–to–5 scale) which is sent by defendant Union to a delinquent mortgagor. Examination of the other mortgage histories in evidence reveals that No. 5 letters had been sent to other delinquent mortgagors. However, the Harper mortgage history is the only mortgage history in evidence in which a No. 1, 2, 3, or 4 letter did not precede the sending of a No. 5 letter.

In determining whether the No. 5 letter sent to the Harpers permits any inference of a racially discriminatory foreclosure practice on the part of defendant Union, it is necessary to consider the letter in relevant context.

The monthly payment on the Harper mortgage note was due on the first of the month. The grace period of 15 days thus expired on the 15th of the month; and thereafter the Harper note became delinquent. The Harpers began to reside at the Rawnsdale Road home on October 20, 1972. However, their first mortgage payment was not due until December 1, 1972. That payment was made on December 13, 1972. With the January 1973 instalment unpaid on January 15, in accordance with the regular practice of Union, a telephone message was left at the Harper residence. The chase card shows that on the same day "He phoned will mail 1–19–73." The payment was not received until January 23.

The February payment was received on February 14, but on March 6, 1973, a mes-

sage was left at the residence "About NSF check." On March 8, a call was made to the residence by Mr. Asmondy. The chase card shows "Just home with new baby, will tell husband—they aware of check." Mr. Asmondy, who made the call, said that this was the crux of the conversation; and that Mrs. Harper did not say how she was feeling physically. Mrs. Harper testified that the first conversation in March was with Mr. Asmondy. She remembered "telling him that I was not working; that I was ill, and that her husband was going to do the very best he could, and he would get in contact." She also remembered Mr. Asmondy responding, "Well, maybe you shouldn't be there in that house, maybe you shouldn't be there." She said this upset her and she hung up the phone.

The chase card next shows a contact on March 14, 1973, when "He called will pay $305 to cover check 3–17 will call me about March payment on 3–20. Said wife just out of hospital with operations." Mr. Asmondy inserted at this point a note: "Watch conflicting stories." Asked what he meant by this, Mr. Asmondy responded, "Mrs. Harper had said she just had new baby, and Mr. Harper said she had two operations. Either had baby or operations. If she said new baby, why didn't Mr. Harper say new baby." Mr. Harper's version of the conversation is that he had told Union Savings about his wife's complications, and the expense of hiring a housekeeper ($45 a week), that he had tried to assure Union that payments would be made on the mortgage.

Asked if he gave a check in February 1973 that did not clear, he answered, "I can't honestly say that." He said he called the bank and told them a check may be coming through that may be dishonored. After a second call he went down and either gave them a new check or paid cash, at which time he saw Mr. Asmondy. The chase card shows, "3–20, he in and replaced check."

The chase card also shows that Mr. Harper said the March payment would be made by March 30, 1973. When no payment was made on March 30, a message was left at the residence to call Union. Again on April 5, 1973, he was called. He said he made the March payment on April 3, and that he would make the next payment by April 15. The March payment was received on April 9, but the April payment was not made on April 15. On April 18, Mr. Harper was called and he said he would call Mr. Asmondy on April 19. When a call was not received, Mr. Asmondy on Friday, April 20, 1973, called Mr. Harper's place of employment, according to the chase card, but he was gone; and there was no answer at the residence. There is no record on the chase card of any conversation between Mr. Harper and either Mr. Asmondy or any other person at Union on Friday, April 20. But on that day the No. 5 letter was sent to the Harpers by attorney C. H. Royon at the direction of either Mr. Asmondy or Mr. Sulik.

The Harpers stated that they received the No. 5 letter on Saturday (April 21) and that they telephoned Mr. Asmondy at his home. Mr. Harper testified:

We called him to try and find out why the letter had been sent, because I believe I had spoken with Mr. Asmondy that Friday and explained to him that I would be late, and everything seemed to be O.K. But when I called him on Saturday to refer to the letter, he was very nasty and he hung up on me. And at that point, I believe the following Monday I sought the advice of an attorney.

Q. Did you have an attorney intervene at this point?

A. Yes . . . .

Q. What happened?

A. I had the attorney to call Mr. Asmondy. And according to the attorney Mr. Asmondy said that that letter was simply a form letter to anyone being late, and that since my payment had been sent in or had been received early that Monday morning, that my mortgage was up to date.

The chase card, however, indicates "Call RNA [Robert N. Asmondy] at home 4/22 [Sunday]. Told him to call me Monday at office." Moreover, in Mr. Harper's testimo-

ny given July 30, 1975 (hearing on the temporary restraining order), he said nothing about speaking to Asmondy on Friday, April 20, explaining "that I would be late." All he mentioned was the attorney's call to Mr. Asmondy after receipt of the April 20 letter:

> Upon receiving the letter . . . I immediately called an attorney. At that time he advised me to pay the April premium. I so paid this. I believe the attorney called Mr. Asmondy, and . . . the attorney told me at that time that Mr. Asmondy simply laughed about the matter, and stated that Mr. Harper's mortgage was not in danger.

Mr. Harper was then asked, "How was the April, 1973, deficiency resolved, if at all?" He answered:

> It was paid on Monday, I believe, which would have been the—I believe it was—let's see, the 22nd—23rd, I believe; but it was paid by, again, bank money order or cash.

Upon all the evidence on this point it is concluded that the Harpers did not call the bank on Friday; and the April instalment was paid on Monday, April 23, only after Mr. Harper was instructed by his attorney to make the payment. This contradicts the impression left by the testimony of Mr. Harper at the trial that the check was in the mail and arrived at the bank on April 23. Insofar as the Harper mortgage history is concerned, it is concluded that the April delinquency, viewed in context, warranted a written notice of delinquency. All attempts by telephone to reach the Harpers concerning the unpaid April instalment, earlier promised for April 15, had failed. Moreover, this experience came on the heels of Union's receipt of an NSF check for February and the repeated calls and unkept promises that preceded the late March payment on April 9.

In March, Union had also learned that Mrs. Harper had given birth to a baby; it thus learned that she was no longer working. Since her income of $6500 a year was a substantial part of the total income listed in the financial statement of the Harpers when they applied for the Union mortgage loan, her inability to work jeopardized the Harpers' ability to keep up with their mortgage payments. At the same time Union learned, according to the Harpers' testimony, that they also had the added expense of a housekeeper because of Mrs. Harper's condition. The drastic change of the Harpers' economic condition better explains the remark of Mr. Asmondy to Mrs. Harper, "maybe you ought not to be there", than that he made it with a racial animus. Understandably, however, this tactless remark had a cutting edge to a bedridden mother just home from the hospital with a new born baby.

Based on the Harper mortgage history, just highlighted, a written communication demanding immediate payment of the delinquency certainly was justifiable. In the other mortgage histories, the delinquencies, more extensive than the Harpers' delinquency as it stood on April 20, 1973, did not produce a No. 5 letter as the first communication. By comparison, the Royon letter, red stamped "Final Notice", which stated "failure on your part to pay this loan in full . . . on or before April 24, 1973, will mean that I shall be forced to commence foreclosure action", was too harsh.

However, the sending of this letter does not warrant a finding of racial discrimination. The letter did induce payment on April 23 of the overdue April installment. Union did accept the payment on the 23rd. This fact, together with Mr. Asmondy's statement, as quoted to Mr. Harper by his attorney, that the letter was only a form letter, overcomes any possible inference that this most severe letter employed by Union was sent to the Harpers, a black family, either because they were black or they lived on an all white street. This conclusion is further buttressed by the fact that Union made no attempt of any kind to follow through on the foreclosure threat contained in the Royon letter.

Immediately below the chase card entry of 4–20–73 "No. 5," written in blue ink, an entry appears written in red ink. It states:

6-14-73 WPS says watch "Black Problem." He complaining.

Entered by Mr. Asmondy, he was quizzed extensively concerning its meaning at both the hearing of July 30, 1975, and at the recent trial. Thus, in the latter part of the cross examination of Mr. Asmondy about the meaning of "Black Problem," he answered on July 30, 1975:

This apparently had been made—an implication had been made somewhere along the lines of a racial situation, and the bank apparently was taking advantage of it.

Asked to explain that, he stated:

This is why the "Black Problem" would have been put on the card by myself. In other words, in a situation somewhere along the line,—

The Court: Conversation with whom?
The Witness: With Mr. Harper or Mrs. Harper.

A (Continuing)—the direct implications would have been made that: Why are you bothering us—or something—because we're black? Or Somewhere along those lines.

Although he stated at the time that he recalled entering the words "Black Problem" on other collection chase cards, later examination of all the chase cards revealed no chase card with such an entry, nor for that matter the entry, "White Problem."

At the trial the genesis of the entry of June 14, 1973, was revealed. On that date a complaint of the Ohio Civil Rights Commission based on a charge of James R. Harper against Union Savings was received by Union. It bears the stamp "June 14, WPS" (Mr. Sulik). Attached to the certified letter from the Ohio Civil Rights Commission dated June 12, 1973, was a copy of a "charge affidavit" written and signed by James R. Harper on April 23, 1973. Of

course, it was on April 23, 1973, that Mr. Harper made his late April payment on his mortgage after receiving the Royon letter, dated April 20, 1973. Among other things, the Harper affidavit stated:

On April 21, 1973 I received a notice of foreclosure as of April 24, 1973. Since I am the only Black head of the household on my street, and since I have been harrassed, and further since the holder of my mortgage is known to residents on the street, I believe I have been unlawfully discriminated against because of my race as I know of no White householder having been foreclosed in this manner.[4]

Plainly enough, and it is concluded that, the arrival at Union on June 14, 1973, of Mr. Harper's discrimination charges against Union, and his supporting affidavit, just quoted, were the source of the red-inked entry of June 14, 1973, made by Mr. Asmondy at Mr. Sulik's direction.

Pressed further to interpret the term "Black Problem" during his cross-examination by plaintiffs' counsel at the trial, Mr. Asmondy stated:

He has a hang up. He is hollering discrimination, just as much as a drinking problem.

While the words "Black Problem" assessed alone, absent the total context, would raise an implication of racial discrimination, it is manifest that it was Mr. Harper's charge filed with the Ohio Civil Rights Commission (which, of course, he had a legal right to file), that generated the entry, "Watch 'Black Problem' He complaining," entered in red ink on the chase card on June 14, 1973.

Again, Union's deeds speak louder than its words. Ten months separate this entry from the commencement of the foreclosure action. During the months immediately following the entry payments were routinely accepted, even though late. Yet no ac-

---

4. Whether it was known to the residents of Rawnsdale that Union was the holder of the Harper mortgage was not shown by any evidence offered at the trial. Although Mr. and Mrs. Harper testified as to a lack of civility towards them by residents on the street, no evidence was offered, and no reasonable infer-

ences may be drawn from the evidence in the record, that Union, once having decided to grant a loan to the Harpers, a black family, was asked or contacted by anyone on the street or by anyone else, to change Union's lending decision or to take any steps to foreclose the Harper mortgage.

tion was taken against the Harpers when they made a late June payment on June 27, or a late July payment on July 23, or in August. Surely no discrimination against the Harpers can be detected in the chase card entry of August 23, 1973, made by Mr. Asmondy, except for the "Hold check" note:

> He in office paid $356.12. Closing costs $150.64. September payment to be paid by 9–15–73. If not he will call. Hold check presented 8/23/3 until 8/31/3. Had big discussion pertaining to title paper and payments.

Acceptance of late payments for June, July, and August 1973, delay in cashing the August 23 check until August 31, and further postponement of payment of the closing costs, due since October 20, 1973, represent enforcement forbearance, not the vigorous and discriminatory collection enforcement procedures charged by the plaintiffs in their complaint. It also indicates that Union's loan service department was following Mr. Sulik's instructions: "Handle as normal account" entered on the chase card on August 28, 1973, following a conference with an Ohio Civil Rights Commission representative and discussion of Mr. Harper's complaint with Sulik and Friend (Union's attorney). Completing this "Black Problem" discussion, it is noteworthy that Mr. Asmondy testified, without contradiction by the Harpers, that at no time did he discuss with them the complaint which Mr. Harper filed with the Ohio Civil Rights Commission. Asmondy stated that their discussion at all times concerned only the collection of monies due on the account.

### C.

Although different dates appear in the record it is established that sometime in 1973, perhaps as early as May, Mr. Harper's employment with National Life of Vermont terminated. Thereafter, he had some part time employment. However, he was not again fully employed until late December 1973, when he became a buyer for Halle's shoe department. Mrs. Harper resumed employment in February 1974, with the Cleveland Board of Education. Undoubted-

ly, this shrinkage of employment and added family health care expenses were the chief cause of the financial difficulties that overtook the Harpers during 1973 and 1974. As a result they got behind in their mortgage payments.

Their mortgage history, including their credibility with Union, worsened markedly during the last four months of 1973 and 1974. A point of beginning is Mr. Harper's promise, reflected in the chase card entry of 8–23–73, that the closing costs of $150.64 and the September payment would be made by 9–15–73. September 15 passed without payment. On September 21, Mr. Harper was in the office at which time he gave a check postdated 9–30–73. In the amount of $482.20, it included $331.56 owed to the account and the still unpaid $150.64 closing costs. On October 8, a payment of $307 was made. An NSF notice of the September 30 check was received by Union on October 12, 1973. The chase card reflects four unanswered telephone calls through the balance of October, messages left either at the place of employment (Mr. Harper's part time office) or messages left with his wife.

In November the Harpers made one payment of $307 on November 2, and made a payment (their last) by check of $307 on November 13. This check was later returned NSF. In all, 14 entries appear on the chase card during November. A number of messages left at the home were not returned by Mr. Harper. On November 12, he called, stating he was changing offices. Four times he made promises to make payments of mortgage amounts and to pay the closing costs and overdue account payments and charges; but these payments were never made.

The first entry in December is on the 19th, when collector Simmons phoned the residence. The entry reads:

> Spoke to her—told her we must see in office—claims making payment—told her must be certified check. She will give message.

The next entry 12–31–73 by the same collector reads:

Phone residence. He claims will be in today between 11 and 1:00 p.m. 12–31–73 2 p.m. no answer at residence. Office phone still disconnected.

An entry on 12–24–73 states:

He phoned. Now employed at Halle's (manager of men's shoes) will be in 12–31 —thinks our record wrong—promised $1,000 1/10/74.

An entry of 12–31–73 reads: "Promised will be in 1–10 with at least $1,000."

January entries reveal:

1–11–74 Phoned him at place of employment 621–2700. Will be in on lunch hour approximately 11:30 a.m. today.

1–11–74 5 PM he came in office laughing—spoke to Sulik. Claims commission check delayed until next week. I will call him Monday and advise how much is arrears.

1–14–74 Collector Simmons called him a figure $1100.20 (3 times 307 plus (179.20) closing costs) equals $1100. He will pay by certified check on 1–17–74.

1–17–74 P.M. He in office. Had only $400 which we would not accept. Told him all by 1–18. Per Sulik—he to oblige by PM 1/18/74.

1–18–74 Called place of employment. Out on business—called again, he in meeting. Called back in 15 minutes. 1/18/74 Collector Simmons. He phoned will have $1100.20 by a.m. Monday certified check.

1–21 a.m. Called him at place of employment, he claims will now be in by a.m.

1–22–74 Collector Simmons spoke to Sulik. If no response from him today don't call place of employment. He will send letter in a.m. to advise of foreclosure.

The foregoing history from September 1973, through January 22, 1974, shows that two checks, one in the amount of $482.20, the other in the amount of $307, were returned NSF. In several of the other mortgage histories in evidence more than two NSF checks were given Union by the mortgagor. However, in each case NSF checks were all made good. Somewhat surprisingly Mr. Harper testified that he did not recall whether his two NSF checks in September and November were paid. The record shows that $307 was paid, but the balance of $175.20 of the September check (including the closing costs) was not paid. None of the November 13, check of $307 was ever made good. The November mortgage history further shows that on November 12, Mr. Harper promised to make several payments according to a schedule which he proposed. Failure to keep these promises differentiates his case from several other mortgage histories in which Union agreed to accept payment schedules to bring accounts current. With some extensions these schedule payments were kept. The continuous pattern of promises made and not kept during November, December, and January, explains and warrants Union's decision finally reached January 14, that the full delinquent balance of $1100.20 must be paid by certified check.

As seen, Union had refused to accept the payment of $400 from Mr. Harper on January 17, 1974. This $400 payment did not meet the balance of the $1100.20 then owed (and which Mr. Harper had agreed to pay by certified check on January 17, 1974). Nevertheless, Mr. Harper sent a money order for the $400 by certified mail. It was received by Union on January 22, 1974. W. P. Sulik, assistant vice president, loan service department, thus wrote Mr. Harper on January 24:

Please be advised we cannot accept the enclosed money order for $400. Our agreement was for $1100.20 to be paid by cash or certified check. The aforementioned amount was to be paid by January 17, 1974, or foreclosure action would be pursued. Since you have not kept your part of the agreement, I am recommending foreclosure to the foreclosure committee.

Encl: 1 money order, amount—$400.

### D.

█ Monday, January 28, Mr. Harper responded to Mr. Sulik with a four-page letter which his counsel correctly characterizes as "emotional." It commences by stating

It has been brought to my attention that an actual hardship case, in regards to a mortgage, received special leniency and consideration when the mortgage is in the rears."

He then proceeded to elaborate what he regarded as "the honest hardship circumstances that surround my mortgage standing." He mentioned the birth of three children and discussed the April 20, 1973, "scare letter." He then stated:

Later one attorney helped me to uncover the facts that I was not the legal owner of this home because a title research company related that the title, nine months later, was still not in my name. Consequently I was told that I could not procure mortgage insurance. In full view of all this, we also had been cheated out of possession of a copy of the mortgage papers that were due me.

He then asked:

What were your intentions Mr. Sulik? Why was Union Savings and Loan negligent in such an important function of the mortgage transactions? The judge will want to know and he will want to be thoroughly satisfied with your response. Why was I forced to engage two attorneys and go in debt—to clear up these irregularities.

Finally, he closed by advising Mr. Sulik,

. . . my intentions if you proceed are to counter sue you and your establishment. My attorneys will present these facts. They will be willing to testify to the ordeal and to their findings—with dates of findings and letters of evidence. The ruling judge will hand down the decision as *all* the facts will be presented.

S. H. Wardwell, Jr., vice president of Union, answered Mr. Harper's letter on February 27, 1974. His letter begins:

We have your recent letter to our Mr. Sulik wherein you enumerate your misfortunes and make sweeping allegations about this Association in a vain attempt to excuse your delinquency under the terms of your mortgage contract with us. Perhaps a recitation of the facts will put the matter in proper perspective.

The most blatant untruth in your letter alleges that the title to your property was not in your name as long as nine months after we told you it was. The fact is that the title was transferred to Jame R. and Janice E. Harper on October 20, 1972, which is not only a matter of public record at the Cuyahoga County Courthouse but is also guaranteed by the Commercial Standard Title Insurance Co. under their number 73–012370. If you paid for information contrary to this, you should ask for your money back.

The certified copy of the warranty deed from William C. Collishaw and Judith N. Collishaw, husband and wife, the grantors, to James R. Harper and Janice E. Harper (husband and wife), the grantees, received in evidence reflects indeed that it was recorded in the office of Mark McElroy, County Recorder, on October 20, 1972, at 2:42 p. m. Also, the paid stamp, dated October 20, 1972, of George N. Voinovich, County Auditor, is on the certified copy of the deed. Hence, once more, the undisputed facts in the record do not bear out either the letters of Mr. Harper or his sworn testimony in affidavits or testimony given in the course of these proceedings. Thus, on this point, despite the information provided him by Mr. Wardwell, stating that transfer of title to James R. and Janice E. Harper on October 20, 1972 was a matter of public record at the Cuyahoga County Court House, he later swore in an affidavit, dated May 13, 1975, filed with Judge Lloyd O. Brown, in support of the motion to stay the sheriff's sale of the property, as follows:

Defendant further says that he purchased the property located at 3652 Rawnsdale Road, Shaker Heights, Ohio 44122, November 1, 1973, and that he occupies the premises and paid the mortgage for several months to the mortgagee, Union Savings Association, and subsequently discovered that the title to the property was not in his name.

Mr. Wardwell's letter of February 27, 1974, thus continues:

Copies of mortgage documents are not handed out as a matter of course, but are

available to any of our borrowers who request them. All you need do is ask. The real crux of this matter is your inability or unwillingness to repay your mortgage according to the completely valid terms of the contract. Your first monthly payment was December 1, 1972, and was paid within the 15 day grace period as set forth in the Mortgage Note. Of the fifteen payments due between December 1, 1972, and the date of this writing, only four (4) have been made within the 15 day grace period after the due date. We are also holding several of your bounced checks.

In light of the above events, it is surprising that you only received one letter from our Loan Service Dept. asking that you adhere to your contract with us or face legal action. Though we are sympathetic to your personal problems, you are now four (4) months delinquent on your mortgage contract, an amount in excess of $1,400.00, and on Friday, March 1, 1974, another payment will be due. This exceeds the bounds of patience and reasonableness and unless your delinquency is paid in full by March 1, 1974, we shall institute foreclosure action.

Probably in response to the Wardwell letter, a Mr. Anderson of Consumer Counsellors called with a plan of $300 plus $50. The chase card entry continues: "Told him not agreeable—he to contact Harper and advise." By letter dated March 4, 1974, the Ohio Civil Rights Commission notified Mr. William Sulik, manager, Union Savings Association, by letter, in part, as follows:

The Ohio Civil Rights Commission has carefully reviewed and discussed our investigator's documented investigation report. In regular session on February 12, 1974, the Commission entered on its record a finding of NO PROBABLE CAUSE TO CREDIT THE ALLEGATIONS OF THE CHARGE. The matter has, therefore been dismissed and the Complainant notified of this disposition. [Capitalization in original.]

Plaintiffs' counsel argues that it was receipt by Union of notification of "no proba-

ble cause" that triggered Union's decision on March 20, to proceed with foreclosure. Since Mr. Harper also received notification, rather it is concluded that it is far more likely that the notification Mr. Harper received prompted him on March 6, 1974, to visit Union. This was his first appearance in the Union office since January 17, 1974. The chase card on 3–6–74 states as follows:

Harper in. Told him account to date or foreclosure. Gave him to 3–18 to bring account current.

Thus, even though Mr. Wardwell had indicated the deadline of March 1, to bring the account current, thereafter on March 6, 1974, Union gave the Harpers an additional 12 days to bring the account current. This persuasively dispels the suggestion of plaintiffs' counsel that as soon as Union received the "no probable cause" letter from the Ohio Civil Rights Commission, Union then proceeded with the foreclosure.

### III.

#### A.

R. N. Asmondy, as manager, loan service department, on March 19, 1974, directed a written request to Fred Friend (Union's house counsel) to "please file foreclosure" regarding "Borrower: James R. and Janice E. Harper, 3652 Rawnsdale Road, Shaker Heights, Ohio 44122." The document indicated "four months delinquency," original amount of loan—$37,600 and balance of mortgage—$30,632.99. As "pertinent data," Mr. Asmondy noted: "over obligated, and employment problems."

Oral argument was postponed one day to determine the "extent of [this] knowledge concerning [Mr. Harper's] obligations." Mr. Asmondy answered:

It was basically a decision that I made in just a tone of the conversation. As I say, there was no direct indication that he owed this fully or he owed this company and he had to pay this company and so forth. It was just the way I was reading the man in our conversation that we had. Call it instinct or whatever you want to call it, this is basically it.

Calling it "personal professional experience or whatever," he then went through various instances in the chase card, all of which references have previously been itemized. For example, he noted that the April 15 (1973) payment "doesn't come in after being called and he said he was going to mail payment on April 3 and again before April 15," and then stated:

> Again it is a situation where through experience you sort of start seeing through these things where people are making you these promises and can't follow through with promises and the only thing really that would be affecting him at this point or one of the biggest problems would be that other creditors may be pressing him.

And then concluding this train of thought, he summarized:

> There is just that continuous sequence in there that is indicating to me that the house payment was the most important payment—were having problems with it. So if he were having problems with the house payment I would have to assume that other payments are also in jeopardy.

Even though Mr. Asmondy on March 19, 1974, was not yet privy to the nature of the extent of other indebtedness of the Harpers, his reasoning in finding that the Harpers were "over obligated" was credible and bona fide. He also noted "employment problems." Even though Mrs. Harper resumed employment in February 1974 (off work for one year because of childbirth and rearing), and Mr. Harper started to work for Halles on December 29, 1973 (with last regular employment in May 1973), these periods of unemployment amply verified his finding of "employment problems."

Union's loan committee approved the foreclosure action on March 20, 1974. Plaintiffs argue that since the chase card and the appraisal were among the documents submitted to the loan committee, entries relative to race on these documents were introduced as a factor and influenced the foreclosure decision of the loan committee. However, it has already been shown that the entry of 6–14–73 "WPS says watch 'Black Problem' He complaining," previously did not induce foreclosure action. Hence, there is no factual basis for inferring that this entry in any way influenced the loan committee.

■ Counsel also has in mind the appraisal card for the Rawnsdale Road property purchased by the Harpers from the Collishaws. This appraisal card was one of the enclosures submitted by Mr. Asmondy with the written recommendation for foreclosure. The appraisal form includes a section headed "Neighborhood," under which are printed three categories in a horizontal line: "American," "Mixed," and "Foreign." [5] On the Rawnsdale property appraisal the word "Mixed" is circled. Asked to explain the circling of this term on the Rawnsdale appraisal card, he first stated that the street on the date of the appraisal contained both black and white residents. It was his opinion that the circling of the term "mixed" means "apparently a high ethnic area in which purchases were made by blacks." But when he was asked what the high ethnic group was living there at the time he answered, "I couldn't tell you offhand." Counsel for the plaintiffs, on the other hand, in final argument, expressed the belief that these words were code words, showing the racial compo-

---

**5.** These three terms, according to chief appraiser Oltmans who went to work in 1958 as an appraiser with Union, are a "holdover from many years ago." Mr. Wardwell testified that these terms mean American-born and foreign-born. "Mixed" means a mixture of American-born and foreign-born. Mr. Wardwell indicated that a mortgage in a foreign-born neighborhood was the least risk from a lender's standpoint. Whatever these terms once meant their elimination was long overdue when they were finally removed from the form in late 1975. Both Mr. Wardwell and Mr. Oltmans insisted that the term "American" would include blacks because they are American-born, and the term "Mixed" was not directed to blacks. No instructions for appraisers as to how to use or apply these terms were admitted to by Union's witnesses, or otherwise shown to exist. Although the ambiguity of these undefined terms created a potential for misuse, the facts in this case, as discussed in the text, do not show the terms were used in any racially discriminatory manner.

sition of a neighborhood. They said when the word "American" is circled, it means white. When both "American" and "Mixed" are circled it means black mortgagors in a predominantly white area, and that "Mixed" means a mixture of both white and black mortgagors. With reference to the Rawnsdale Road appraisal, plaintiffs' counsel offered a more plausible interpretation of the circling of the word "Mixed" than did Mr. Oltmans. However, the argument of counsel for the plaintiffs proves too much. First of all, it contradicts Mr. Harper's statement that he was the only black head of household on an all white street. But further, this classification on the appraisal card of the Rawnsdale property suggests no reason for Union to believe that in a mixed neighborhood it could change the trend by foreclosing the Harper property.

On the other hand, a document that the loan committee undoubtedly gave consideration to in making its decision to foreclose the Harper property, was Mr. Harper's letter of January 27, 1974. Mr. Wardwell, a permanent member of the committee, had answered that letter on February 27, 1974 —just three weeks before the committee determined to order the foreclosure. The instability of Mr. Harper as a continued mortgagor was manifested (1) by Mr. Harper's misstatements concerning title to the property not being transferred into the name of the Harpers, (2) the emotion-laden content of the letter, and (3) the threat of Mr. Harper to counter sue if a foreclosure action was brought.

Plaintiffs also contend that an inference of more vigorous foreclosure enforcement against blacks in predominantly black areas than against whites in white areas and blacks in black areas, is shown by the 11 mortgage histories received in evidence. These histories show that for all 11 mortgagors Union exercised considerable forbearance in their collection procedures. Although there were the same continuous followup phone calls (promises made and often promises not kept in making payments), eventually all of these mortgages became current. Moreover, in three of the mortgage histories foreclosure actions were filed, and the mortgagors were required to bring their accounts current as a condition of dismissing the foreclosure action. This bore out Mr. Wardewell's testimony that partial payments are not accepted and arrearages must be paid in full once foreclosure actions are commenced. Thus, the refusal of Union on April 10, 1974, the date the foreclosure action was filed, to accept the Harpers' payment of $1456, when over $2000 was then due, conformed with the uniform policy of Union.

At the hearing of July 30, Mr. Harper testified that a case similar to his own in which Union had discriminated against a black family in a white neighborhood concerned the family of Mr. and Mrs. John Hoytt, who lived on Glencairn Road in Shaker Heights. However, nothing more was said about this case at the trial. Presumably investigation did not bear out the claim of Mr. Harper in this respect.

In this trial plaintiffs direct attention to a black couple who purchased a home on Strathavon Road in Shaker Heights. However, this mortgage, issued in 1967, did not become seriously delinquent until 1972, when a divorce proceeding was started. However, $1100, to bring the account current, was paid on November 27, 1972, and the case did not go to foreclosure even though the action was filed. However, thereafter over several years the account became delinquent on various occasions. But each time through letters and contacts Union was finally able to get the account current. Thus the only history that is at all comparable to the Harper mortgage history is one that involved a black family in a predominantly white neighborhood. Yet here was exercised the same mortgage foreclosure forbearance that Union exercised with whites in predominantly white areas and blacks in predominantly black areas. Upon all of these facts the inference which the plaintiffs seek to have this court draw from the 11 mortgage histories is not supported in the record.

Since this court has previously ruled that the cause of action did not accrue until July 30, 1975, it is appropriate to consider the true financial condition of the Harpers which burst into full view as a result of the bankruptcy action which they filed on June 11, 1974. The Final Judicial Report, filed March 27, 1975, contains the following summary of the voluntary bankruptcy petition which the Harpers filed:

Total debts, $83,968.88. Total property $500. Secured claims, $69,919.00 unsecured claims without priority, $14,067.88.

Union was not yet aware of the Harpers' full and detailed condition when it finally filed the foreclosure action on April 10, 1974. However, the voluntary bankruptcy petition's revelations totally corroborate Mr. Asmondy's assessment that the Harpers were "over obligated," and completely corroborate his judgment in recommending foreclosure of the Harpers' residence on Rawnsdale Road, Shaker Heights, Ohio.

The Harpers were represented by a black attorney in the foreclosure case; and he also filed the bankruptcy petition because the Harpers were in "dire financial straights." The court called him as a witness in this trial; and each party was permitted to cross-examine him. Colloquy between plaintiffs' counsel (white) in this fair housing action and the Harpers' former counsel is enlightening on the issue of whether race played any part in the foreclosure:

Q Mr. Snipes, on what basis did you believe that race was not a legitimate issue to be raised?

A If I felt that it was a legitimate issue to have been raised or risen, I would have raised it.

Q What did you do to determine whether or not that was a valid issue?

A Well, we happen to be in a capitalistic society. And in a capitalistic society you talk in terms of money. And when you owe for a mortgage, you got to pay. When you borrow money, you have to pay. All right.

And when you get delinquent, you're subject to be foreclosed on. And that is for you, me, Chinese or African, barbarian or anybody. So this happens to be a case where that he was delinquent, so, therefore, he was foreclosed on.

 Upon all the evidence it is concluded that the plaintiffs have failed to raise even a prima facie case of a violation of section 3605. The evidence shows overwhelmingly that Union, which granted 90 percent financing to the Harpers to make it possible for them to purchase the home on Rawnsdale, foreclosed the Harper mortgage solely for the justifiable business reasons. Race played no part in Union's foreclosure decision.

Judgment is rendered for Union and against the Harpers.

IT IS SO ORDERED.